**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED MAY 20, 2003**

*In re* JK, Minor.

_____

FAMILY INDEPENDENCE AGENCY,

    Petitioner-Appellee,

v                                 No. 121410

MELISSA KUCHARSKI,

    Respondent-Appellant.

_____

PER CURIAM

    A judge in the Family Division of the Kent Circuit Court terminated the respondent mother's parental rights to her three-year-old son after concluding that there were attachment and bonding problems between the respondent and the child. Following an unsuccessful appeal to the Court of Appeals, respondent filed a timely application for leave to appeal in this Court. While that application was pending, unknown to this Court, the family division of the circuit court engaged

in the apparently unprecedented and extraordinary action of allowing the foster parents to adopt the child.[1] Again, unaware of this adoption, we remanded for additional findings.

Because we find the evidence supporting termination to be insufficient, we vacate the order terminating the respondent's parental rights.[2] We also take this opportunity to make clear what we believe to be obvious, that the circuit court is not permitted to proceed with an adoption following a termination of parental rights where the parent's appeal of that decision remains pending.

## I. FACTS AND PROCEEDINGS

In April 1999, the Kent Circuit Court, Family Division, assumed temporary jurisdiction over the minor child on the basis of the respondent's admitted marijuana use. The child, who was then sixteen months old, was placed in a foster home by Catholic Social Services[3] while the respondent entered an in-patient substance-abuse treatment program. For the first ten months of the child's wardship, Catholic Social Services

---

[1] None of the members of this majority can recall having ever encountered this situation, in which an adoption order entered while a timely appeal was pending in a parental-rights-termination case.

[2] The trial court also terminated the parental rights of the father, Travis Englehart. He did not appeal.

[3] Catholic Social Services provided foster care for court wards on the basis of a contract with the Kent County Family Independence Agency.

planned to return the child to the respondent. Visits between the respondent and the child went well, and the respondent actively interacted with the child. Initially, the visits were weekly, but later were increased to twice weekly. The child was sufficiently bonded to the respondent that he cried when forced to leave her.[4]

Catholic Social Services subsequently placed the respondent in the same foster home. The foster parents reported that the respondent did a good job with the child and attended to most of his needs.

In June 2000, Catholic Social Services filed a petition[5] to terminate the respondent's parental rights on the basis of allegations that the conditions that led to the adjudication continued to exist and there was no reasonable expectation that the respondent would rectify the conditions within a

---

[4] At the July 1999 review hearing, the social worker, Lora Holewinski, opined that the respondent did not require parenting classes or a psychological examination. She praised the respondent for her attentiveness to the child during the visits, and her only negative comment was about the respondent's initial defiance in the substance-abuse program, which had subsided by the time of the July 1999 hearing.

[5] A permanent-custody petition was filed earlier, in April 2000. However, the allegations in that petition refer to the respondent's mother, rather than the respondent. The respondent's mother was also the subject of neglect proceedings.

reasonable time given the child's age.[6]  As a factual basis for the allegation against the respondent, Catholic Social Services alleged that the respondent failed to submit to a required psychological evaluation, failed to adequately participate in counseling at the Dakotah Family Treatment Center and Aftercare Process Program,[7] and was continuing to use alcohol and marijuana.  The petition also alleged that the respondent was inattentive and acted inappropriately during agency visits with the child.

Catholic Social Services had referred the respondent to therapist Elaine Hoogeboom for weekly substance-abuse therapy.[8]  In November 2000, Catholic Social Services, for the first time, expressed specific concern with the respondent's bonding and attachment to the child.  The social worker asked the respondent's therapist to address the newly raised concern in weekly therapy with the respondent.  Hoogeboom began meeting weekly with the respondent, her boyfriend, and the child to address the bonding and attachment issue. Several of

---

[6] This is a ground justifying permanent custody pursuant to MCL 712A.19b(3)(c)(i).

[7] However, at the October 1999 statutory review hearing, the social worker testified that the respondent had completed the in-patient portion of the program, but did not "graduate" because the weekend before the "graduation" she had violated one of the personal-conduct rules of the program.

[8] The respondent began meeting with Hoogeboom weekly in July 2000.

4

the sessions involved only the respondent and her boyfriend because the foster mother failed to bring the child.  Less than one month after the bonding and attachment therapy began, Ywania Richardson, a therapist who practiced in Genesee County, conducted a bonding and attachment assessment of the respondent and her child.  She observed their interaction for less than one hour.

The permanent-custody trial took two days in early 2001. At the beginning of the trial, the parties stipulated that only legally admissible evidence could be used to establish the bonding and attachment issue.  That constituted an acknowledgment by all parties that the bonding and attachment issue was not a basis supporting temporary jurisdiction.  MCR 5.974(E)(1).  At the trial, the social worker admitted that the respondent completed the substance-abuse program and an independent-living program.  She was employed,[9] had secured housing,[10] and was able to care for herself.  Her previous substance abuse was no longer a problem and she had remained

---

[9] The respondent's independent-living supervisor, Alejita Rodriguez, testified that respondent earned $1,400 a month.

[10] At the time of the permanent-custody trial, the respondent was living in a two-bedroom apartment, which she procured on her own.  It was appropriately furnished and contained clothes and toys for the child.

free of controlled substances for over one year.[11]  Although the respondent did not initially follow through with a psychological evaluation when first referred 1½ years earlier, she did follow through with the second referral in August 1999.[12]  The psychologist who conducted the evaluation found nothing in her intellectual and psychological profiles that prevented her from appropriately parenting the child.

The social worker's new concern about the respondent's ability to parent related to her alleged lack of attachment and bonding with the child.  She testified that the respondent did not interact appropriately with the child during visits.  According to the worker, the respondent sometimes had difficulty engaging the child in activities, sometimes seemed lethargic during portions of the visits, and sometimes inappropriately brought candy to visits scheduled in the morning.

Hoogeboom, the respondent's therapist, opined that the respondent and the child were bonded.  She recommended that the child be placed with the respondent.  According to Hoogeboom, the respondent appropriately disciplined the child

---

[11] Despite this recognition that the respondent had remained substance-free for over a year, the June 2000 permanent-custody petition erroneously alleged that the respondent continued to use alcohol and drugs.

[12] The respondent completed the two-part evaluation in August 2000 after missing a December 1999 appointment.

and interacted with him by playing and singing with him.

Ywania Richardson, a therapist contacted by the foster mother and paid by Catholic Social Services for the respondent's assessment, also testified at trial about the bonding and attachment issue.[13] Richardson met with the respondent and the child on one occasion for approximately one hour to evaluate their bonding. On the basis of this single meeting, which took place less than one month after Hoogeboom began addressing the bonding and attachment issue with the respondent, Richardson opined that they did not have a well-attached, bonding relationship, but explained that this may have resulted from the fact that the child had been in a number of foster homes.[14]

At the conclusion of the permanent-custody trial, the trial court terminated the respondent's parental rights, despite recognizing that the respondent had made significant improvement. The respondent was drug-free, had graduated from high school, had completed an independent-living course, and obtained adequate housing and employment.

Nonetheless, the trial court held that the respondent's lack of bonding with, and attachment to, the child provided a

---

[13] Catholic Social Services referred the respondent to Richardson after the referral to Hoogeboom.

[14] The child had resided in five different foster homes during wardship.

7

basis for termination. To reach this conclusion, the court gave greater weight to Holewinski's and Richardson's testimony. The court discounted Hoogeboom's testimony because Hoogeboom did not specialize in treatment of the bonding and attachment issue.

The respondent appealed by right to the Court of Appeals, which affirmed.[15] The respondent's counsel filed a timely application for leave to appeal with this Court and filed a copy with the trial court the following day. Despite this, and just two weeks after the respondent filed the application and before this Court ruled on it (even before the date on the notice of hearing in this Court), the trial court entered an order making final the adoption of the child by the foster parents.[16]

This Court initially denied leave to appeal in October 2002. The respondent subsequently filed a motion for reconsideration, which we granted.

## II. STANDARD OF REVIEW

We review for clear error both the trial court's decision that a ground for termination of parental rights has been

---

[15] Unpublished memorandum opinion, issued March 1, 2002 (Docket No. 235602).

[16] This Court was informed of the adoption after a remand to the trial court in August 2002 for updated findings of fact. The trial court filed its findings later that month.

proved by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interests.  MCR 5.974(I);[17] *In re Trejo Minors,* 462 Mich 341, 356-357; 612 NW2d 407 (2000).  A circuit court's decision to terminate parental rights is clearly erroneous if, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.  *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

## III. ANALYSIS

Parents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process. *In re Brock,* 442 Mich 101, 109; 499 NW2d 752 (1993).  A due-process violation occurs when a state-required breakup of a natural family is founded solely on a "best interests" analysis that is not supported by the requisite proof of parental unfitness.  *Quilloin v Walcott,* 434 US 246, 255; 98 S Ct 549; 54 L Ed 2d 511 (1978).

### A

The Legislature has enumerated specific conditions, one

---

[17] The rules governing proceedings regarding juveniles were amended and moved to new MCR subchapter 3.900, effective May 1, 2003.  The provisions on termination of parental rights are now found in MCR 3.977.  In this opinion, we will refer to the rules in effect at the time of the lower-court decisions.

or more of which must be proved before a court is permitted to terminate a parent's rights to her child. MCL 712A.19b(3). The petitioner bears the burden of establishing the existence of at least one of those grounds by clear and convincing evidence. *Id.; Trejo, supra* at 350. The circuit court in this case relied on the following enumerated grounds to terminate the respondent's parental rights to her son:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> * * *

> (ii) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> * * *

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age. [MCL 712A.19b(3).]

If the petitioner establishes a statutory ground for termination, "the trial court must issue an order terminating parental rights unless there exists clear evidence, on the

10

whole record, that termination is not in the child's best interests." *Trejo, supra* at 354; MCL 712A.19b(5). "Subsection 19b(5) attempts to strike the difficult balance between the policy favoring the preservation of the family unit and that of protecting a child's right and need for security and permanency." *Trejo, supra* at 354.

The decision to terminate the respondent's parental rights was clearly erroneous. Pursuant to MCL 712A.19b(3)(c)(ii), termination of parental rights is justified where (1) the parent is the respondent in a child-neglect proceeding, (2) other conditions exist that cause the child to come within the court's jurisdiction, (3) the parent received recommendations to rectify those conditions and had a reasonable opportunity to do so and the respondent failed to rectify the other conditions, and (4) there is no reasonable likelihood she will do so within a reasonable time given the age of the child. The "other conditions" upon which the trial court relied were the lack of a bond or attachment between the mother and the child. However, we hold that the petitioner did not establish the lack of such a bond or attachment by clear and convincing evidence.

The respondent's therapist met with her weekly. After ample opportunity to observe the respondent and the child interact, she opined that they were adequately bonded. She

recommended that the child be returned to the respondent's care. The respondent's supervisor in the independent-living program also found the respondent's interaction with the child to be appropriate. The psychologist who conducted the respondent's court-ordered evaluation found nothing in her psychological makeup that prevented her from appropriately parenting her child. By contrast, the therapist hired by Catholic Social Services met with the child and the respondent only once for approximately one hour. Her observation of the respondent and the child occurred less than one month after the respondent's therapist began addressing the bonding and attachment issue. Reliance on this one minimally informed source rather than on the fully knowledgeable staff of persons who had worked directly with the respondent over an extended period was an insufficient basis for severing the parental bond between mother and son.

In concluding that the respondent and her child were not properly bonded, the trial court ignored the fact that, immediately after the agency filed the petition for termination of parental rights, visitation was automatically suspended for several months pursuant to MCL 712A.19b(4). The counselor was then notified only two months before trial[18] to

---

[18] The social worker first asked the counselor to address the bonding and attachment issue in November 2000. The trial began in January 2001.

address the bonding and attachment issue with the respondent. Any suggestion that the respondent was given "a reasonable opportunity" to rectify the alleged bonding and attachment issue is unwarranted.

By discounting the testimony of Hoogeboom, the respondent's counselor, the trial court also ignored the fact that it was the social worker who referred the respondent to Hoogeboom for counseling on the bonding and attachment issue. If the social worker truly believed that Hoogeboom's credentials were insufficient to address bonding and attachment, it was that worker's responsibility to make an alternate referral. Despite Richardson's alleged superior credentials, the social worker never suggested that the respondent receive treatment from her.

The fundamental right of a parent and child to maintain the family relationship can be overcome only by clear and convincing evidence, which, in this case, was not supplied by this single witness who observed the mother and child together for just one hour at a time when she had been addressing the bonding and attachment issue in therapy for less than one month.[19]

_____

[19] The social worker's testimony also failed to establish clear and convincing evidence that the respondent failed to address her bonding and attachment issue. Rather, the social worker's testimony about the respondent's occasional lethargy and bringing candy to morning visits does not, in our

The second basis for the trial court's order is MCL 712A.19b(3)(g), which permits termination where (1) the parent fails to provide proper care or custody for the child and (2) there is no reasonable expectation that the parent will be able to do so within a reasonable time given the child's age. Again, petitioner failed to present clear and convincing evidence of this ground. The social worker from Catholic Social Services acknowledged that the mother had appropriate housing and employment, was able to care for herself, had completed an independent-living program, and remained drug-free for over one year. The respondent in this case fulfilled every requirement of the parent-agency agreement. Her compliance negated any statutory basis for termination.

This Court has held that a parent's failure to comply with the parent-agency agreement is evidence of a parent's failure to provide proper care and custody for the child. *Trejo, supra* at 360-363. By the same token, the parent's *compliance* with the parent-agency agreement is evidence of her ability to provide proper care and custody.[20]

judgment, rise to the level of clear and convincing evidence required to permanently sever the bond between a parent and her child.

[20] If the agency has drafted an agreement with terms so vague that the parent remains "unfit," even on successful completion, then the agreement's inadequacies are properly attributable to the agency and cannot form the basis for the termination of parental rights. Even if, in some case, it can

There were no statutory grounds for terminating the respondent's parental rights pursuant to MCL 712A.19b(3).[21] For that reason, we need not address the question whether termination was in the best interests of the child. MCL 712A.19b(5). We conclude that the trial court "clearly erred" by terminating respondent's parental rights.[22]

---

be conceived that satisfaction by the parent of the parent-agency agreement does not render the parent "fit," in this case we are satisfied that the respondent's satisfaction of the agreement did evidence that she was no longer an "unfit" parent.

[21] Several of the trial court's written findings of fact on remand suggest that it may have been influenced by the relative advantages of the adoptive home compared to the mother's home. We remind the family-division judges of what we said nearly fifty years ago:

> "It is totally inappropriate to weigh the advantages of a foster home against the home of the natural and legal parents. Their fitness as parents and question of neglect of their children must be measured by statutory standards without reference to any particular alternative home which may be offered to the [child]." [*Fritts v Krugh,* 354 Mich 97, 115; 92 NW2d 604 (1958).]

We note the trial court's fact-finding on remand simply because it suggests that improper comparisons between the homes of the adoptive and natural parents may have been made in determining whether to terminate the respondent's parental rights. This type of comparison may explain why the respondent's parental rights were terminated despite what we believe is the lack of clear and convincing evidence in support of that termination.

[22] Despite the lack of evidence supporting the petition for termination of the respondent's parental rights, the trial court terminated her rights and refused to return the child. Consequently, the child was deprived of a secure and stable home with his natural mother, a mother who had completed every

15

B

A parent whose rights to her child have been terminated has the right to appeal that decision. *Reist v Bay Circuit Judge,* 396 Mich 326; 241 NW2d 55 (1976).[23] MCR 5.993(A)(2) provides an appeal of right in the Court of Appeals for an order terminating parental rights. The Adoption Code prohibits a trial court from ordering an adoption if a parent has filed an appeal of right from an order terminating her parental rights until the Court of Appeals affirms the order terminating parental rights. MCL 710.56(2).[24]

_____

term of her parent-agency agreement and who had, according to her own court-ordered therapist, successfully addressed her alleged lack of bonding with, and attachment to, her child. Rather than returning the child after the natural mother completed every task asked of her, the agency delayed the child's security and stability with his own mother and sought the opinion of a different therapist who claimed that the respondent lacked the proper bonding and attachment to properly parent her child.

[23] In *Reist,* all the participating justices agreed that parents have the right to appeal. The Court divided on the basis for that right. Justices Levin, Kavanagh, and Williams found that parents have a constitutional right to appeal. Justices Coleman, Fitzgerald, and Lindemer, on the other hand, found no need to address whether parents had a constitutional right to appeal, as they found a basis for the appeal in the relevant statute and court rule.

[24] We acknowledge the accelerated pace at which circuit courts in this state are now required to determine whether to terminate the parental rights of a parent in a neglect proceeding. MCL 712A.19a(1) requires a circuit court to hold a permanency-planning hearing within one year after the child is made a court ward. The federal adoption and safe families act, 42 USC 675(5)(E), requires the filing of a petition for permanent custody when a child has remained a family court

16

While the statute refers to affirmance by the Court of Appeals, it must be read in conjunction with MCR 7.215(F), which establishes the effective date of a Court of Appeals opinion:

> (1) Routine Issuance. Unless otherwise ordered by the Court of Appeals or the Supreme Court or as otherwise provided by these rules,

> (a) the Court of Appeals judgment is effective after the expiration of the time for filing a timely application for leave to appeal to the Supreme Court, or, if such an application is filed, after the disposition of the case by the Supreme Court . . . .

In this case, the respondent filed a timely application for leave to appeal to this Court within twenty-one days after the date of the judgment of the Court of Appeals. MCR 7.302(C)(2). Thus, the trial court improperly allowed the foster parents to adopt the child before the resolution of the respondent's application for leave to appeal.[25] The judgment

---

ward for fifteen of the previous twenty-two months unless (i) the child is being cared for by a relative, (ii) a state agency has documented in a case plan a compelling reason for finding that filing such a petition would not be in the best interests of the child, or (iii) the state has not provided to the child's family such services as the state deems necessary for the safe return of the child. In this case, the state did not provide the respondent with the proper services necessary for the safe return. The state agency referred the mother to a therapist to deal with the bonding and attachment issue; the therapist's opinion (that the respondent had no problem in this area) was later discounted.

[25] At oral argument it was reported that the county designated this as an "at risk" adoption. Apparently, this adoption was labeled that because the county took a "risk"

17

of the Court of Appeals never became effective.

The trial court was without authority to ignore this Court's appellate jurisdiction by allowing the adoption to take place while a timely application for leave to appeal was pending in this Court. The adoption in this case was invalid because it violated the provisions of MCL 710.56(2) and MCR 7.215(F). Further, to allow such an adoption to occur would be to distort the nature of this Court's review of the termination decision by requiring, as an effective precondition to reversal of the termination order of the trial court, that we be prepared also to undo an adoption that has become a fait accompli. Parents whose rights have been terminated by the trial court are entitled to appellate review of this decision without that review being compromised by the specter of appellate courts having to undo an adoption as a concomitant act to the granting of relief for those parents. Such a result is simply contrary to the structure of the justice system established by our constitution and laws.

The members of this Court have each reflected upon this case at length. There is no ideal result. There is no outcome that will avoid the imposition of suffering upon

---

that this Court might vacate the termination of parental rights. We explicitly disapprove of this practice. Such an "at risk" adoption does a disservice to all the parties involved.

either the birth parent of this child or his present adoptive parents. If there is a practical reason that adoptions not be permitted while a parent is in the process of appealing a termination decision, it is that reflected in the choices now available to this Court in this case. It is in the interests of both the natural parent and the child, as well as the interests of the integrity of the justice system, that the termination decision not be reviewed, as it has been here, under the specter of having to remove the child from adoptive parents in order to give faithful effect to the law. To say the least, this Court has not taken this decision lightly.[26] Rather, we are fully cognizant that it is an imperfect decision and that it will have a significant effect on the lives of everyone connected with this case.[27] We conclude,

---

[26] The premature adoption that occurred in this case was a procedural anomaly, leading the Court to proceed with caution. We remanded this case for an update on the status and granted the respondent's motion for reconsideration after additional consideration. The deliberative process required in this unusual case caused this Court to expend a greater length of time than is usually necessary in appeals of decisions regarding the termination of parental rights.

[27] Although appeals from decisions terminating parental rights are already decided on an expedited basis, MCR 5.993(C)(1), 7.212(A)(1)(i), and 7.212(A)(2)(a)(i), significant efforts have been ongoing in this Court to further expedite this process. This Court previously opened an administrative file to address appellate delay and, in April 2002, we published for comment proposed rules that would eliminate delayed applications for leave to appeal to the Supreme Court, effectively reducing the delay between the rendering of a decision by the Court of Appeals and filing of

however, that the result reached is compelled by Michigan law and that the values underlying this law are important in upholding the family relationship.

In order to prevent this situation from recurring, we hold that trial courts are not permitted to allow an adoption of a child whose parents' rights have been terminated while the parents' appeal of that termination is pending in either the Court of Appeals or in this Court.[28]

an application for leave to appeal in this Court. Those proposals will soon be ready for final action upon the receipt of related proposals from the Court of Appeals, with which they must be coordinated. In addition, this Court's internal administrative processing of cases has been modified to assure the earliest possible Supreme Court consideration of these cases. Further, in response to concerns about delay in the Court of Appeals and a study from the National Center for State Courts regarding dependency appeals, in August 2002, we directed the Chief Judge and the Chief Clerk of the Court of Appeals to convene a Dependency Appeals Task Force, including representatives of affected courts and groups, to devise methods for expediting dependency appeals. The task force's report was filed May 5, 2003.

As an offshoot of the task force on appellate-delay reduction, discussions have also been initiated regarding the need to address reducing trial-court delay in handling termination cases. In response to the federal government's Child and Family Service Review of the Michigan foster-care and adoption system, a work group comprised of family-division judges and employees of the Family Independence Agency has been appointed to address such delay.

[28] MCL 712A.19c requires the trial court to hold a posttermination review hearing, within ninety-one days of the termination decision and at least every ninety-one days thereafter. At these mandatory posttermination review hearings, the court can monitor the progress of the parent's appeal and ensure that an adoption does not take place until the parent's right to appellate review has been exhausted.

20

## IV. Conclusion

We reverse the judgments of the Court of Appeals and the Kent Circuit Court terminating the respondent's parental rights. Further, we vacate the order of adoption because it is invalid. Finally, we order the Family Independence Agency to commence appropriate efforts toward reunification of the respondent and the child.

> Maura D. Corrigan
> Michael F. Cavanagh
> Marilyn Kelly
> Clifford W. Taylor
> Robert P. Young, Jr.
> Stephen J. Markman

*In re* JK, Minor.
_____

FAMILY INDEPENDENCE AGENCY,

 Petitioner-Appellee,

v               No. 121410

MELISSA KUCHARSKI,

 Respondent-Appellant.

_____

WEAVER, J. *(nonparticipation statement).*

 I have decided not to participate in this case for the following reasons:

 •First, to expedite for the sake of the child this case, which has been in the Supreme Court for over a year;[1]

 •Second, to defer to the decisions of the respondent party, the biological mother, and her attorney not to

_____

 [1] After this case is completed, I will publish at my personally funded website, JusticeWeaver.com, a proposed court rule designed to shorten the appellate process and eliminate appellate delays in cases involving the termination of parental rights by ensuring that they will not be in the appellate system for more than eleven months (eight months in the Court of Appeals, three months in the Supreme Court) after the claim of appeal is filed.

remit/waive any possible disqualification; and

•Third, to maintain public trust and confidence in the judiciary.

There are no court rules establishing the procedure for a Michigan Supreme Court justice's decision whether or not to refrain from participation in a case. Traditionally, the decision has been left to the discretion of the individual justices, and nothing has been revealed to the public.

I propose for public comment the following amendments of Michigan Court Rule 2.003. These amendments provide that when the issue of disqualification is raised, a justice should publish in the record of the case the reasons for the decision to participate in the case or not, and outline the procedure for a justice to raise his potential disqualification with the parties and their attorneys.

> (C)(5)*Disqualification of a Justice*. If a justice's participation in a case is challenged by a written motion or if the issue of participation is raised by the justice or another justice, the challenged justice shall decide the issue and publish in the record of the case that justice's reasons for the decision to participate or not.

> * * *

> (D)(2)*Procedure for a Justice.* If it appears that there may be grounds or possible grounds for disqualification, the justice may have the clerk of the supreme court send the parties the justice's written explanation of the grounds or possible grounds for disqualification, and ask the parties and their attorneys to consider whether to waive any disqualification. If, following disclosure of any

> grounds or possible grounds for disqualification other than personal bias or prejudice concerning a party, the parties all notify the clerk of the supreme court in writing that the justice should not be disqualified, and the justice is then willing to participate, the justice may participate in the case.

I have in effect followed the above procedures in this case.

My decision not to participate in this case is based on a communication that I had on Monday, April 28, 2003 with the state's central Family Independence Agency office in Lansing regarding an issue raised by a justice at oral argument on April 9, concerning the number of attachment and bonding experts in Michigan—"Do you think there are 10,000 experts in this field?"

The communication occurred at the end of a telephone conversation with a staff person to the Governor's Task Force on Juvenile Justice (Children's Justice Task Force), which I chair. This staff person is employed by the state's central FIA office in Lansing with task force funds. The conversation dealt with matters pertaining only to task force business until the end, when in passing, I asked the staff person how many experts on attachment and bonding there are in Michigan. Although he did not know, he connected me to someone whom he thought might know, a person who is also employed by the state's central FIA office in Lansing. After checking, this person informed me that there may be two such experts in

3

Michigan and certainly not 10,000.  Late on Monday, April 28, I shared that information with the justices on the Court, writing:

> In a preliminary contact with the Family Independence Agency in Lansing the agency indicated that it was aware of two Michigan experts on bonding and attachment.  Ms. Richardson is one of those two experts.

Chief Justice Corrigan contacted me late on Friday, May 2, and suggested that my communication with the state FIA could be considered an ex parte communication, contrary to the Code of Judicial Conduct Canon 3.  Although I believed this communication was not an ex parte communication—that the state's central FIA office in Lansing is not a party in this case because the Kent County division of the FIA filed the petition and is a party in the case—as discussed below, I recognized that it is a question of law and fact which has not been decided by this Court.

Because the Chief Justice raised the question whether it was an ex parte communication, and ex parte communications can be grounds for disqualification, I believed the parties and their attorneys had a right to know of the communication. Late Friday, May 2, I contacted the Clerk of the Supreme Court for the "proper procedure" to raise my possible disqualification.  Although Michigan Court Rule 2.003(D) applies to trial judges and does not refer to Supreme Court

4

justices, this court rule sets out the procedure that seemed to be possibly applicable. Pursuant to Michigan Court Rule 2.003(D) and Code of Judicial Conduct Canon 3C and D, I decided to contact the parties and attorneys and raise the issue of my possible disqualification in this case.[2]

In an attempt to expeditiously resolve this issue, on Tuesday, May 6, in accordance with the court rule, MCR 2.003(D), I had the Clerk of the Supreme Court send to the parties and attorneys a letter detailing the substance of the communication, stating that the information had been given to the other justices, informing them that it did not appear that the communication with the staff of the state's central FIA in

---

[2] Code of Judicial Conduct Canon 3C provides, "A judge should raise the issue of disqualification whenever the judge has cause to believe that grounds for disqualification may exist under MCR 2.003(B)."

Code of Judicial Conduct Canon 3D provides, "A disqualification of a judge may be remitted as provided by MCR 2.003(D)."

Michigan Court Rule 2.003(D)provides:

"If it appears that there may be grounds for disqualification, the judge may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification. If, following disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceedings. The agreement shall be in writing or placed on the record."

Lansing had given or would give the Kent County FIA or their attorney a procedural or tactical advantage, and stating that I had not been prejudiced or biased by the communication or by the information I received.  I asked the parties and attorneys whether they would waive or remit any possible disqualification, and asked them to respond with that decision in writing to the Clerk of the Supreme Court, Mr. Corbin Davis, by 5:00 p.m. on Friday, May 9.

On Thursday May 8, the Kent County prosecutor, representing the Kent County FIA office, and the attorney/guardian ad litem for the child both sent in their decision to remit any disqualification.  Late Friday afternoon, May 9, the attorney for the respondent party, the biological mother, sent a letter stating that he had not been in contact with his client, and that accordingly he was declining to remit any disqualification.  I requested the Clerk of the Supreme Court to forward a copy of the attorney's letter to all the justices.[3]  Later that same day I had the Clerk of the Supreme Court contact the attorney for the biological mother by fax, informing him that he had the time he needed to make contact with his client before making the decision on whether to remit any disqualification. On Monday,

---

[3] The Clerk of the Supreme Court did forward a copy of the attorney's letter to all the justices on Monday, May 12, 2003.

6

May 12, the biological mother's attorney notified the Clerk of the Supreme Court by faxed memorandum that he had communicated with his client, and that she agreed with the decision not to remit or waive any disqualification.

I continue to believe that the state's central FIA office in Lansing is not a party in a termination-of-parental-rights case brought by a county FIA office. Nevertheless, preliminary research does not reveal any decision by this Court regarding whether the state central FIA office in Lansing is a party in a case brought by a county FIA office. This question is one of both law and fact. In order to resolve it, this Court would need to hold an evidentiary hearing and make a finding on this point. Such a hearing and the time needed to make the legal decision would further delay this case.

Accordingly, for all the above reasons, I am not participating in this case.

Elizabeth A. Weaver

7