# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. R. BALIS, Minor.

UNPUBLISHED
April 30, 2015

No. 323472
Midland Circuit Court
Family Division
LC No. 13-004263-NA

Before: BORRELLO, P.J., and RONAYNE KRAUSE and RIORDAN, JJ.

PER CURIAM.

Respondent appeals as of right the circuit court's August 15, 2014, order terminating her parental rights to the minor child, AB, under MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions), (g) (failure to provide proper care or custody) and (j) (reasonable likelihood of harm). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

On August 30, 2013, the Midland County Department of Human Services (DHS or "petitioner") filed a petition seeking to remove eight-month old AB from respondent's care and terminate her parental rights. The petition indicated that AB's father was "on the sex offender registry from 2009," that he was being investigated regarding alleged sexual abuse against his other daughter, and that "[t]here is threatened harm of [AB's father] sexual abusing" AB. The petition stated that respondent had agreed to a Child Protective Services (CPS) safety plan that required the child's father to "leave the home and have no contact with [AB] until further investigation" and that AB's father was later found in the home.

The trial court held an adjudication hearing on September 11, 2013, where respondent admitted that she failed to comply with a safety plan by allowing AB to have contact with her father. The court exercised jurisdiction over AB and ordered respondent to comply with a case service plan. The case service plan required respondent to participate in counseling and other services deemed necessary to facilitate reunification with her daughter. The court ordered AB to remain in her foster home and that respondent have supervised visitation with the child. For the next seven months, respondent participated in various services provided by petitioner and had regular parenting time with AB.

In February 2014, petitioner learned that AB was sexually assaulted by her father on five occasions while in respondent's custody. One assault occurred after the CPS safety plan had

-1-

been put in place which prohibited AB's father from having any contact with her. In a report dated April 15, 2014, Nicole Minnis, an infant mental health specialist with Community Mental Health for Central Michigan, who provided Baby Court services to respondent, indicated that on March 25, 2014, respondent informed staff at the Health Department that AB's father sexually assaulted AB when he was in the home "when he was not supposed to be there."

On April 21, 2014, the trial court held a statutory review hearing, during which multiple witnesses testified that respondent was not making progress with the services that were provided, that she was unable to consistently provide basic needs to AB during parenting time, and that she resisted any attempt to address the problems with her prior relationships, including that with AB's father. Testimony showed that respondent did not recognize that her relationship with AB's father was unhealthy. The trial court, finding that the conditions that caused AB to be placed in foster care had not improved, authorized the filing of a petition to terminate respondent's parental rights.

Petitioner filed a petition to terminate respondent's parental rights on May 5, 2014. The petition asserted that respondent "was not making progress with services and would not engage with the therapist, Nicole Minnis, to discuss healthy relationships and did not participate in the parenting group through Baby Court." The petition indicated that respondent "refused vocational training" and "did not demonstrate adequate parenting techniques."

The trial court held a two-day evidentiary hearing to determine whether to terminate respondent's parental rights. At the hearing, Angela Lijewski, a psychologist with Partners in Change, testified that she evaluated respondent relating to this matter. She testified that she had a concern with respondent's history of abuse and abusive relationships, including with AB's father. Lijewski stated that intervention would be required "in order for [respondent] to safely parent her child," and recommended individual therapy and "in-home parental monitoring and training for her in order to ensure she's appropriate caring for the [child]." Lijewski also testified that despite the safety plans that were in place, respondent admitted to her that AB's father was in the home between August 28 and 30, 2013.

Minnis testified that she was not able to make progress with respondent and that respondent was not meeting treatment goals. Minnis believed it would take a "year or longer" for respondent to meet the treatment goals. She explained that respondent did not benefit much from the parenting classes and that she "stated that she already knew 98 percent of the material and that went in line with how she was parenting." Minnis also explained that respondent would agree to do things that she was told to do in terms of feeding AB but did not actually do so. Minnis testified that there were concerns with respondent's truthfulness, such as her denial of contact with AB's father when, in fact, she had made contact with him, asked him to return to the home, and indicated that she wanted to be in a relationship with him. Additionally, Minnis testified, as late as February and March of 2014, respondent denied that there were warning signs with her relationship with AB's father.

Minnis testified that it was in AB's best interests to terminate respondent's parental rights "[b]ecause of [the child]'s development. She needs permanency in her young life. She needs some stability." Minnis admitted that there was a bond between AB and respondent but also explained that the bond was insufficient to protect AB. When asked if her concerns in this case

were "the feeding," Minnis stated that "it's the ability to keep [AB] safe, and for [respondent] to be involved in healthy relationships, so she's not putting [AB] at risk in the future; not intentionally, but just by the choices that she's made."

Carol Thorton, a volunteer visitation supervisor at DHS, testified that she observed 26 visits between respondent and the child from September 2013 to April 2014. Thorton testified that respondent had told her "on one occasion [in December 2013] that they, as in DHS, was making her divorce the only man that truly loved her for who she was." She testified that respondent frequently talked about AB's father to AB during parenting time.

Andrea Bennett, a foster-care specialist with DHS, testified that "the specific issue [that led the child into care] was that she made a safety plan . . . to now allow [AB's father] to not have conduct with [AB] due to . . . a pending sexual abuse case with his other daughter. And the CPS worker found [AB's father] in the home, actually laying on the floor with [AB]." When asked if she felt as though respondent "rectified that barrier, the condition that led her child into care," Bennett stated that she did not. She answered negatively when asked if respondent ever "truly addressed" her relationship with the child's father. Bennett testified that respondent "didn't think it would help her case" and "just want[ed] to move past that." Bennett also explained that respondent was not truthful with her, noting that she "continuously denied having contact with [AB's father]" even though she was actually calling him. Bennett also testified that respondent struggled to respond to cues during her parenting time. She also answered negatively when asked if respondent participated in and benefitted from counseling. Bennett acknowledged that respondent had obtained employment.

Bennett concluded that she believed it was in AB's best interests to terminate respondent's parental rights because AB "has made tremendous strides in her development" while in foster care and respondent is unable to understand "how to provide the appropriate care for [AB] in those developments." Bennett also explained that AB needs stability in her life and that she would not recommend relative placement. She answered affirmatively when asked if there was a high likelihood of adoption based on AB's age.

Respondent presented Heidi Maki, Heather Fisher, and Doug VanderLaan as witnesses. Maki, a certified lactation consultant, testified that respondent was her client since June 21, 2012 and that she had done well with breast feeding. However, Maki testified that respondent stated that AB's father had been arrested for molesting his older daughter. Maki testified that respondent stated that she believed the allegations against AB's father were false.

Fisher, Executive Director of the Pregnancy Resource Center (PRC) of Mid-Michigan, testified that respondent participated in the "Earn While You Learn Program," a parenting education program. Fisher explained that as of the date of the hearing, respondent was still participating in the program. When asked about notes relating to abuse in respondent's file, Fisher stated that "[i]t could have been" discussions about abusive relationships but that she could not be sure without reviewing the notes.

VanderLaan, "an out-patient therapist, specializing in marriage and family counseling" for LIST Psychological Services, testified that respondent "came in[to his office] on her own accord" on April 29, 2014, and that he saw her five times. VanderLaan explained that

respondent "has made some progress" in "[u]nderstanding . . . why she got into those relationships, and what she needs to do differently in the future relationships." VanderLaan stated that he and respondent "briefly talked about the abuse by the father" and had also discussed AB's father "[n]ot in full, but . . . it is coming,". VanderLaan opined that it could be very quickly with an "ah-hah moment" or "take months." VanderLaan further explained that pursuant to an assignment he had given, respondent "was able to write almost a book" describing signs that would indicate that someone would "need to get out" of a relationship. He stated that respondent had made progress in understanding that recognizing those indicators is helpful in parenting.

Respondent testified that she was employed at McDonald's. Respondent explained that before AB was born, she went to the PRC "to be able to do what [she] could to support [AB]." Respondent testified that AB was eight-and-a-half months old when removed from her care and that she has no other children.

Respondent testified that she "tried to the best of [her] abilities" to participate in counseling with Minnis but that it was difficult because she "pretty much lost [her] whole family in one day." Respondent testified that she began to open up with Minnis "when [she] kind of felt that [Minnis] was going to help [her] as opposed to . . . basically just trying to tell [her] what to do." She explained that after AB's father "confessed to touching [AB] as well," "the way [Minnis] perceived me changed. It became more guarded, more judgmental. And I felt like she thought I knew and I let him do it."

Respondent testified that she needed to "provid[e] [AB] with the nutrition and the safety that she needs." She explained that she needed to "[b]e careful about who [she] brings around [AB]" by "looking for red flags." Respondent explained that in hindsight, she would not have had a relationship with AB's father. She understood that she violated the case service plan by allowing AB's father back in her home and learned from this experience. When asked if she believed she needed the parenting classes, respondent answered that she "believe[d] it wouldn't hurt." Respondent admitted that she needed improvement.

Respondent testified that she had one "hook-up" since AB was removed and stated that she planned to only "date outside of the home, and when a significant amount of time has passed and no red flags have come up," she would introduce her significant other to AB. Respondent stated that if any red flags arose, the relationship would be terminated immediately.

Following the evidentiary hearing, the trial court concluded that clear and convincing evidence supported terminating respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). In its written opinion, the trial court stated that it "ha[d] concluded that [respondent] has made little to no progress during the pendency of this case to remediate the issues that brought [AB] under the Court's protection." The court explained that while AB's father was being investigated relating to alleged criminal sexual conduct against his other daughter, respondent voluntarily agreed to not allow any contact between AB and AB's father. The court stated that despite this agreement, respondent "blatantly violated it" by allowing AB's father in the home. The court found that "it was revealed very far into the case management that it was at this time this Father sexually abused [AB] an eight month old baby." Citing Minnis' April 11, 2014, report, the court noted that respondent had conversed with staff at the Health Department and

"very explicitly said that the Father 'touched AB then licked her vagina then certain number of hours later he kissed her and had sex with her.'"

The trial court explained that respondent "has never recovered from [her] horrific personal history" and that she "has a history of poor decision making, impulsivity, and unstable and unhealthy relationships." The trial noted that Baby Court was "directly geared" at addressing respondent's failure to protect AB from the father and other men who may harm AB, but that it "was never fully engaged in by [respondent], despite a passing hope that it was working." The Court stated that respondent "never truly engaged with . . . Minnis," and found that respondent was "very loyal to" AB's father and "inaccurately complained that [DHS] was forcing her to divorce [him]."

The court also found that there was a "nutrition issue" and that respondent repeatedly rejected guidance. The court considered Minnis' testimony that respondent's "progress was not cumulative from session to session like most clients," and found that respondent "was not capable of making changes." The court found that respondent was unable to "take 'cues' that are so necessary in the care taking of a child."

The court found that respondent "made no progress on the issues of her own sexual abuse and why she would choose men who sexually abused others, including her own daughter." The court found that respondent failed to progress to unsupervised parenting time because "there was no security that she would protect this child." The court noted that respondent's own therapist stated that she "would need 'hands on' treatment for there to be progress," and stated that this "is what occurred for almost a year with Baby Court." The trial court stated, "[c]learly this mother is determined to put her needs above the child's." The court also concluded that the bond between AB and respondent was "not a healthy bond."

The court concluded that there was clear and convincing evidence to support termination under MCL 712A.19b(3)(c)(*i*), (g), and (j) and that it was in AB's best interests to terminate respondent's parental rights. The court stated, "It is the clear conclusion of this Court that this Child would be sexually abused again should she be left in the care of this Mother. It would be an extraordinary injustice to this Child to do anything other than terminate this Mother's rights."

## II. STANDARD OF REVIEW

Respondent contends that the court erred in finding grounds for termination and in finding that the termination was in AB's best interests. "We review for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest." *In re Trejo*, 462 Mich 341, 357; 612 NW2d 407 (2000). A decision is clearly erroneous if we are left with the definite and firm conviction that a mistake has been made. *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003). "When reviewing the trial court's findings of fact, this Court accords deference to the special opportunity of the trial court to judge the credibility of the witnesses." *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005).

## III. LEGAL ANALYSIS

## A. STATUTORY GROUNDS FOR TERMINATION

"Parents have a significant interest in the companionship, care, custody, and management of their children[.]" *In re JK*, 468 Mich at 210. Accordingly, in order to terminate a parent's rights to his or her child, one or more of the statutory grounds set forth in MCL 712A.19b(3) must be established by clear and convincing evidence. *Id.* Because only one statutory ground for termination must be established by clear and convincing evidence, we focus our analysis on MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions). See *In re Utrera*, 281 Mich App 1, 24; 761 NW2d 253 (2008).

Grounds for termination under MCL 712A.19b(3)(c)(*i*) exist when there is clear and convincing evidence that "the conditions that brought the child[] into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services . . . ." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014) (quotation omitted). The court considers both how long it may take for the parent to improve conditions and how long the child can wait for such improvement. *In re Dahms*, 187 Mich App 644, 647-648; 468 NW2d 315 (1991).

Jurisdiction in this case was based on respondent's failure to protect AB when she allowed AB's father to have contact with AB in violation of the safety plan that prohibited the father from being in the home and having any contact with AB. Although it is undisputed that respondent attended services and had parenting time with AB, testimony of the experts involved indicated that "the conditions that brought the child[] into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services." MCL 712A.19b(3)(c)(*i*).

Lijewski testified that, if respondent took custody of AB, intervention including in-home parental monitoring and training would be required to ensure AB's safety. Minnis testified that she was not able to make progress with respondent and respondent was not meeting her treatment goals. Minnis explained that respondent did not take steps to work through problems and failed to process issues related to her relationships. According to Minnis, after seven months of services, respondent failed to acknowledge that her relationship with AB's father was unhealthy. Minnis was concerned about respondent's truthfulness with respect to her relationship with AB's father and testified that respondent denied warning signs that arose during the relationship. Minnis testified that termination was in AB's best interests because she had concerns with respondent's ability to keep AB safe.

Other evidence supported the trial court's finding that respondent was unable to protect AB. According to Thorton, respondent stated that DHS forced her to divorce AB's father and respondent talked to AB about her father. Respondent also told Maki that she believed the allegations against AB's father were false. Indeed, throughout the pendency of the proceedings, the evidence showed that respondent failed to consistently recognize and address her history of unhealthy relationships, including that with AB's father and failed to recognize the impact such relationships could have on AB. Expert testimony presented during the hearing indicated that intervention would be required "in order for [respondent] to safely parent the child."

"While [petitioner] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 842 NW2d 569 (2012). Although a parent may "participate in and complete certain mandated requirements of [a] treatment plan," he or she still must "demonstrate sufficient compliance with or benefit from those services[.]" *Id*. The record shows that respondent failed in this responsibility and the trial court did not clearly err when it found that clear and convincing evidence existed to support terminating respondent's parental rights under MCL 712A.19b(3)(c)(*i*). Given our conclusion that one ground for termination was established by clear and convincing evidence, we need not address the other grounds for termination. *In re Utrera*, 281 Mich App at 24.

## B. BEST INTERESTS

"If the petitioner establishes a statutory ground for termination, the trial court must issue an order terminating parental rights unless there exists clear evidence, on the whole record, that termination is not in the child's best interests." *In re JK*, 468 Mich at 222 (quotation omitted); see also MCL 712A.19b(5). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713.

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*Id*. at 714 (quotations omitted).]

In this case, the trial court concluded that it had "no doubt that this termination is in the best interests of this Child" for both AB's physical and emotional health. The court explained that AB was "doing great in foster care" and that terminating respondent's rights would "maximize this Child's early childhood so that her life as an adolescent, teenager and then adult can be as normal as possible." Petitioner's witnesses indicated that once AB was in her foster home, she began to develop physically and emotionally in a manner that she did not when with respondent. Although this testimony was somewhat contradicted by respondent's witnesses, the trial court is in a better position to give weight to contradictory testimony. *In re Fried*, 266 Mich App at 541. The only expert testimony presented at trial indicated a concern with respondent's history of relationships and inability to safely parent the child. In addition, respondent failed to respond to services and was not meeting her treatment goals. Minnis' testimony showed that respondent failed to appreciate the threat that her relationship with AB's father posed to AB and Minnis and Bennett both testified in favor of termination. These concerns, combined with AB's improvement in the foster home, the high likelihood of adoption, and AB's need for permanency and stability, supported the trial court's determination that termination was in AB's best interests. Although respondent has a bond with AB, the bond is not sufficient to conclude that "there exists clear evidence, on the whole record, that termination is not in the child's best interests." *In re JK*, 468 Mich at 222 (quotations omitted).

Affirmed.

/s/ Stephen L. Borrello
/s/ Amy Ronayne Krause
/s/ Michael J. Riordan