*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. R. NETHAWAY, Minor.

UNPUBLISHED
June 16, 2022

No. 359418
Clinton Circuit Court
Family Division
LC No. 19-028871-NA

Before: GLEICHER, C.J., and SAWYER and GARRETT, JJ.

PER CURIAM.

The circuit court terminated respondent-father's parental rights after he failed to cooperate with services for more than two years. Respondent now contends that termination was not in the child's best interests and argues that the court should instead have placed his daughter in a guardianship instead. Respondent does not have a relationship with his child and made only minimal efforts to address the many barriers to reunification. Under these circumstances, a guardianship was not warranted. We affirm.

## I. BACKGROUND

AN was born on July 3, 2014 to KN. Her paternity was in question and respondent-father did not meet AN until she was four. At that time, respondent was on probation in his home state of Ohio after serving part of his sentence for a 2016 domestic violence incident. Respondent left Ohio without permission and moved in with KN and AN in Michigan from December 2018 through January 2019. However, KN's grandmother evicted respondent from the home for fighting with KN. Respondent had no contact with AN thereafter, until the Department of Health and Human Services (DHHS) intervened in KN's home. In June 2019, KN was hospitalized and she left AN with her maternal aunt and uncle, the Robinsons. The Robinsons had previously had a guardianship of AN. Respondent quickly signed an acknowledgment of paternity and he was given a supervised face-to-face parenting-time session in Michigan. The visit initially went well until AN remembered an incident of domestic violence she had witnessed between her parents.

Respondent made little effort to cooperate with the DHHS throughout these proceedings. He advised the DHHS that he had completed parenting classes and other services while incarcerated in 2016, and did not understand why he had to participate in services related to this case. Despite that recreational marijuana use is illegal in Ohio, respondent admitted to smoking

marijuana "24/7" for chronic pain and did not have a valid medical marijuana card. Respondent did not believe he had a substance abuse problem and begrudgingly agreed to cease use if ordered by the court. Respondent also admitted that he had fathered a total of nine children, none of whom were in his care. He did not provide child support for any of his children and had minimal involvement in most of their lives. His youngest child, G, had been removed from her mother's care in Ohio and respondent had weekly unsupervised visits with her. The Ohio equivalent of the DHHS had not given respondent overnight visits because he was living in a pole barn without running water, an environment deemed unsafe for a child.

From the start of these proceedings, respondent's attendance and participation were sporadic. In the fall of 2019, respondent was briefly incarcerated for a probation violation. He lived three hours away from the Clinton Circuit Court and his driver's license had been suspended. Respondent drove anyway, but missed hearings because of unreliable transportation. On one occasion, respondent falsely told the court that his probation officer would not allow him to attend.

AN's therapist recommended supervised phone or video visits, instead of in-person, until AN felt more comfortable with respondent. Respondent engaged in these visits, although they were short given the child's age. He also submitted to a psychological evaluation, which revealed likely narcissistic antisocial disorder, bipolar disorder, and substance abuse issues. The psychologist opined that respondent was "likely to not conform to the social norms and pretty much do what he wants rather than follow the generally accepted social norms" and had "issues with authority figures." The DHHS ordered respondent to participate in counseling to address his mental health and substance abuse issues, submit to random drug screens, and complete another parenting class. Respondent complied with the parenting class requirement but had difficulty coordinating the others with his health insurance and providers in his area.

When the pandemic struck in March 2020, respondent's performance under his service plan became even worse. He stopped attending video parenting-time session and has had no contact with AN since April 2020. The court suspended respondent's parenting time until he appeared before the court to explain his inconsistency. Respondent refused to participate in video counseling sessions and became hostile with the clinic's employees, leading to his discharge from services in May 2020. Respondent's grandmother evicted him from the pole barn on her property and he moved in with a friend. Respondent stopped communicating with the DHHS because he accused them of kidnapping AN and holding her hostage. He tried to fire his court-appointed attorney and stopped taking his calls. Then in August 2020, respondent was arrested for felonious assault. During the arrest, the police found residue-covered drug paraphernalia and several guns in the home.

Given the limited progress of both parents, the DHHS changed its goal and sought termination of both parents' rights. A termination hearing was conducted in September 2020, but the court declined to terminate mother's rights because she had begun to show progress again. On March 5, 2021, AN was returned to KN's care and custody. Things went very well until April 30, 2021, when KN suddenly passed away. AN returned to the Robinsons' home at that point and began a new round of counseling to address her grief.

The court adjourned respondent's September 2020 termination hearing in the hope respondent could be physically present in the near future. However, respondent pleaded guilty in

Ohio to felonious assault and was sentenced a minimum term of 2½ years imprisonment, and his earliest release date is February 2023. The DHHS encouraged respondent to participate in services in prison, and he later began a cognitive-behavioral therapy counseling program. In the meantime, however, respondent started writing letters to AN that could not be delivered because of the suspension of his parenting time. His phone conversations with DHHS workers were ineffectual, with respondent either trying to convert the workers to his "flat-earth" beliefs or screaming at the workers for kidnapping his daughter. Respondent used postage-paid envelopes sent to him by the DHHS to submit bizarre articles about subjects irrelevant to his case.

Upon learning that no writ could be secured to transport respondent from his Ohio prison to Michigan for a termination hearing, the court determined that the proceeding must be conducted by video. Respondent refused to participate, leaving the prison's polycom room and returning to his cell. The court heard testimony from a caseworker and her supervisor about respondent's limited participation in and lack of benefit from services. They described that despite having sufficient funds to do so, respondent never secured appropriate housing, impacting not only this case but also his bid for custody of G. The witnesses further detailed respondent's poor attendance at parenting time and failure to meaningfully address his mental health and substance abuse issues. Respondent's continued criminality was also a main concern.

The circuit court ultimately terminated respondent's parental rights under MCL 712A.19b(3)(c)(*ii*) (failure to rectify barriers to reunification that arose after the filing of the initial petition), (g) (failure to provide proper care or custody despite being financially able to do so), (h) (imprisonment for such a period that the child will be deprived of a normal home life for a period exceeding two years), and (j) (reasonable likelihood the child will be harmed if returned to the parent's home). The court further determined that termination of respondent's parental rights was in AN's best interests. The court noted that the Robinsons were willing to provide permanence for AN through adoption. Although AN was in relative placement, the court declined to pursue a guardianship as respondent had no real relationship with AN and had never provided support. The court noted that respondent "is hostile and difficult to deal with and he's provided no continuity," a poor combination with AN's need for strong emotional support. Terminating respondent's rights would have no impact on AN's family ties, the court determined. AN had no relationship with respondent's other children and the Robinsons could continue a relationship with AN's paternal grandmother if they deemed it in the child's best interests.

## II. ANALYSIS

Respondent does not challenge the statutory grounds supporting termination. Instead, he focuses on the court's best-interest analysis. Respondent contends that he demonstrated his desire to have custody of AN by completing parenting classes while incarcerated before these proceedings even began and later beginning substance abuse and mental health services. He emphasizes that he advocated for face-to-face, rather than virtual, parenting time so he could develop a bond with AN. Moreover, respondent urges, as AN is in the care of maternal relatives, the parent-child bond could have been fostered during a guardianship.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination

of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We review the court's factual findings in this regard for clear error. *In re JK*, 468 Mich 202, 209; 661 NW2d 216 (2003).

When determining whether termination is in the best interests of the children, the focus is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). Factors relevant to the best-interest determination include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). "[T]he likelihood that the child could be returned to her parents' home within the foreseeable future, if at all," is also relevant. *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 64; 874 NW2d 205 (2015) (quotation marks and citation omitted).

"[T]he fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interests." *Olive/Metts*, 297 Mich App at 43 (quotation marks and citation omitted). Under the right conditions, a court may forego termination and instead place the child in a guardianship. A guardianship allows the children "to keep a relationship with the parent when placement with the parent is not possible." *In re TK*, 306 Mich App 698, 705; 859 NW2d 208 (2014). However, a circuit court is not required to establish a guardianship in lieu of terminating parental rights if it is not in the child's best interests to do so. MCL 712A.19a(9)(c); *In re COH*, 495 Mich 184, 197; 848 NW2d 107 (2014); *TK*, 306 Mich App at 704-705.

The circuit court did not err in finding that termination is in AN's best interests. Respondent is an absentee father who put his own interests before those of his child. Respondent did not meet AN until she was four years old. After respondent and KN broke up in January 2019, respondent did not maintain contact with AN. During these child protective proceedings, respondent visited AN in person only once. The court permitted supervised phone and video visits to foster the parent-child relationship given that respondent lived three hours away. Respondent missed many of those visits. Despite that he had earlier requested telephonic visits in lieu of in person, respondent participated in only one video visit at the start of the pandemic. Respondent claimed that COVID was a government hoax, the DHHS had lied about his marijuana use, and the DHHS had kidnapped his child. Respondent turned the focus on himself and refused to participate in the proceedings and his child's life because he felt he was treated unfairly. As a result of his own behavior, respondent has no relationship or bond with AN.

Respondent similarly declined to address the barriers to reunification based on his personal feeling of inequity. Respondent took no responsibility for AN being in care, shifting all blame on KN. Respondent refused to acknowledge that his absence left AN unprotected. As respondent saw himself as blameless, he was frustrated by the services he was required to participate in. While respondent eventually took a parenting class, he delayed counseling services. Although respondent's psychological evaluation revealed several major areas of concern, respondent refused to address those issues. He began substance abuse counseling, but continued to smoke marijuana

"24/7" and saw no need to stop. And again, respondent refused to continue these services after they were adjusted for COVID protocols.

Respondent also knew that he needed to find housing suitable for a child. Respondent was gainfully employed for a large portion of the proceedings and had adequate funds to rent a residence. Yet respondent never did so. He continued to live in a pole barn with no bathroom and no bedroom for a child until his grandmother had him removed.

Further, respondent's criminal behavior would put AN at risk if she was placed in his care. Respondent acknowledged that he has a long criminal history dating back to his childhood. Respondent did not see his juvenile history as problematic. Despite that his 2016 conviction arose from stalking his wife and causing property damage at her boyfriend's home, respondent adamantly denied a history of domestic violence. Early in the proceedings, respondent repeatedly violated the conditions of his probation and was reincarcerated.[1] Respondent smoked marijuana without a valid medical marijuana card in violation of Ohio law, and often drove without a valid license. And then in August 2020, respondent committed another violent crime, resulting in a 2½-year prison term.

Imprisoned and with time on his hands, respondent suddenly had a resurgence of parental feeling and wrote several letters to AN. As his parenting time had been suspended, the caseworker held these letters for later delivery. Beyond these letters, respondent continued to focus his energy on challenging the system. He continued to believe that the DHHS had exceeded its authority and screamed at the foster care supervisor on the phone. He researched his belief that the Earth is flat and sent articles on this and other strange topics to the caseworker, instead of working on his mental health and substance abuse issues.

Although AN is placed with relatives, she was only seven at the time of termination. She required a permanent, stable home. AN could not wait in limbo for respondent to participate in and benefit from services. It was not in AN's best interests to place her in a guardianship, building up hope that respondent would make necessary changes to safely parent his child. That termination of respondent's parental rights was in AN's best interests was more than adequately supported.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ David H. Sawyer
/s/ Kristina Robinson Garrett

---

[1] Respondent insisted that he should not have been on probation in the first place and threatened to call his senator to rectify the situation.