# STATE OF MICHIGAN

# COURT OF APPEALS


In re CAMERON, Minors.

UNPUBLISHED
February 2, 2016

No. 326830
Otsego Circuit Court
Family Division
LC No. 14-000026-NA


In re R. R. CAMERON, Minor.

No. 326832
Otsego Circuit Court
Family Division
LC No. 14-000102-NA


Before: SHAPIRO, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

In these consolidated appeals, in Docket No. 326830, respondent-mother appeals by right a March 26, 2015, circuit court order terminating her parental rights to the minor children, JC, LC, and RDC. In Docket No. 326832, respondent-mother appeals by right a March 26, 2015, circuit court order terminating her parental rights to the minor child RRC. The court found that termination was warranted as to all the children under MCL 712A.19b(3)(b)(*ii*) (failure to prevent injury or abuse), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(j) (reasonable likelihood of harm). This Court consolidated the appeals on April 20, 2015.[1] For the reasons set forth in this opinion, we affirm both orders.

## I. BACKGROUND

At the initial preliminary hearing on March 13, 2014, Child Protective Services (CPS) worker Sonya Fiel testified that she had been working with respondent and the respondent-father of the children after police contacted her to inform her that JC and LC were wandering around their neighborhood unattended. Fiel testified that the children were not dressed for below-zero

---

[1] *In re Cameron Minors*, unpublished order of the Court of Appeals entered April 20, 2015 (Docket No. 326830).

-1-

weather. The trial court determined that removing the children from the home was appropriate and respondent waived a probable cause hearing. The court ultimately found sufficient evidence to assume jurisdiction of JC, LC and RDC.

The record shows that Gaylord City Police Officer Travis Chellis found JC and LC on March 12, 2014. Chellis testified that JC and LC had snowsuits on but were missing hats and gloves. Chellis stated that the children could not provide the names of their parents; he determined who the parents were by interviewing people nearby. Chellis indicated that he went to respondent's residence after interviewing the children, and stated that when he entered respondent's apartment around 10 a.m., it looked like the children had been up tending to themselves for some time. Fiel testified that respondent informed her that the kids would awaken in the night and break eggs, get into nail polish, and on one occasion, stabbed an air mattress and possibly got into children's Tylenol. Fiel stated that respondent informed her that she locked the children into their rooms at night.

Fiel and Amy Croff, a child services specialist, were present when the children were removed from respondent's home. Fiel testified that the home was in disarray, with matches on the floor. Croff and Fiel testified that JC was happy to be leaving and got upset when she thought for a brief moment that she was not going to leave. LC was also pretty calm.

After being removed from the home, JC, LC and RDC were placed in a foster home through Holy Cross Children Services (HCCS). The record indicates that LC had to be separated from the other siblings because "there were sexual acting-out behaviors and also aggressive behaviors towards the siblings."

Petitioner, the Department of Health and Human Services (DHHS), ultimately petitioned the court to terminate respondent's parental rights to JC, LC, and RDC based on allegations of sexual abuse (at the time, RRC had not yet been born). At a June 20, 2014, hearing, a "Ms. Becker" from HHCS testified that parenting time was suspended due to "possible allegations of sexual abuse" and that the "two oldest children are hypersexualized." Becker testified that the children's first foster placement reported sexualized activities between JC and LC. In addition, Dr. Jason Beatty, D.O., called Becker and informed her that JC tested positive for chlamydia. Becker explained that at one point JC went under a table when asked about seeing her mother. Despite the troubling behaviors, Becker testified that LC was progressing in foster care and JC was also doing well.

Fiel testified at the July 22, 2014 review hearing that Croff conducted an investigation on March 17, 2014 into possible sexual exploitation. Croff testified at the termination hearing that JC disclosed that either her "parent" or "parents" took photographs of her private parts and put the pictures on her computer. Croff could not recall whether JC disclosed that her "parents" or "parent" took the photographs. Croff testified that respondent denied that photographs were taken; instead, respondent suggested that JC was not always truthful.

Following JC's disclosure, Officer Chellis seized computers, hard drives, and thumb drives from respondent's home, but he did not discover any evidence of illegal activity apart from drug use. Croff acknowledged that there was no direct evidence that respondent knew that

the children were being sexually abused and that no compromising photographs were ever found. Croff stated that her involvement regarding her investigation ended around April 22, 2014.

At a July 22, 2014 review hearing, Fiel testified regarding a second investigation. Fiel testified that JC was asked how her visit with her father went, and JC responded by saying that "it went good because my daddy didn't poke me in my vagina." Fiel testified that JC participated in a forensic interview and during that interview JC explained that "her dad put his pueter in her vagina." Fiel acknowledged that at one point during the forensic interview, JC was asked who poked her to which she responded, "everybody does it." Fiel also testified that JC stated that when her father had touched her in this way, he was on top of her and covered her mouth so she could not yell or scream. Fiel testified that JC underwent a medical examination that revealed her hymen was no longer intact and tests revealed that JC had chlamydia. Fiel stated that respondent at one point expressed concerns about the children hearing their father masturbating. Fiel also testified that both JC and LC were acting out sexualized behavior when they were placed in foster care. Fiel testified at the termination hearing that respondent did not show any emotion when she found out that JC had chlamydia. Fiel also testified that neither parent had an explanation as to how JC contracted chlamydia.

Apart from the ongoing investigation and services provided with respect to JC, LC and RDC, on or about October 30, 2014, DHHS filed a petition regarding RCC, who was due to be born on November 1, 2014. Respondent waived a probable cause hearing, and the court authorized the petition regarding RCC. The circuit court ultimately assumed jurisdiction over RCC and consolidated the infant's case with the ongoing case.

The termination hearing occurred over the course of two days on February 26, 2015 and February 27, 2015. During the proceedings, respondent-father voluntarily terminated his parental rights to all four children. The following is an overview of the evidence introduced at the termination hearing:

Chellis, Croff, Dr. Beatty, and Fiel testified about the events that led to JC's, LC's, and RDC's initial removal, as well as the specific sexual abuse allegations and medical evidence showing that sexual abuse occurred. LC's then-foster parent, Rivard, testified that LC had a dramatic change of behavior and that over time he was no longer kicking and screaming and that he was becoming appropriately affectionate. However, Rivard testified that LC reverted to sexualized behaviors around the time he visited his parents. Rivard testified that LC told her that his mother "sucks on me" and that "then the monsters come." According to Rivard, LC stated that he is afraid of going home and that he expressed a particular fear of respondent-father.

Clinical psychologist Kerri Schroder testified that she performed a psychological evaluation of respondent on June 27, 2014. Schroder testified that respondent recounted that respondent-father viewed incest pornography. Respondent told Schroder that she would distance herself from respondent-father if he had abused her children. However, Schroder also testified that respondent questioned whether JC contracted chlamydia during her time in foster care. Schroder described respondent as being in a state of denial and not wanting to admit that JC had been molested and that her attitude was a "wait and see" approach.

DHHS worker Cheryl McCurdy, who facilitated HCCS's work with JC, LC and RDC, testified that respondent was in denial about the abuse. McCurdy stated that respondent did not believe that respondent-father abused JC and that respondent put respondent-father before her children. McCurdy described respondent and respondent-father as codependent. McCurdy acknowledged that respondent was participating in services such as CHS, drug screens, and parenting classes and that respondent was appropriate when having parenting time with RCC. However, McCurdy stated that, in her opinion, termination was appropriate due to respondent's failure to protect the children. McCurdy specifically noted that it is difficult for respondent and respondent-father to be separated from each other and that she envisioned respondent-father still being around the children if they were returned to respondent. Becker testified that she absolutely believed that there was a reasonable likelihood of harm to the children if they were returned to respondent. Becker also explained that JC and LC did not want parenting time with respondent and both children wanted assurances that they would not be left with their parents.

Respondent testified that she would be able to protect her children. Respondent ultimately testified that respondent-father had moved out of her home, but she explained that if the children were returned to her, she would want respondent-father to have contact with them. Respondent testified that she did not believe that respondent-father sexually assaulted JC, but then clarified that she did not want to believe that her daughter was sexually assaulted even though that is what the evidence showed. Respondent testified that she was hoping for some sort of proof that respondent-father had not abused JC. When discussing her statement about respondent-father viewing incest pornography, respondent stated that she imagines that the "actors are not actually related" and that incest pornography was not respondent-father's preference. Respondent admitted that she did see JC acting sexually at one point and that she responded by telling JC that she needed to do that in private. Respondent testified that it is possible that JC contracted chlamydia from someone else and stated that JC mentioned to her that her stepbrother may have sexually assaulted her. Respondent questioned whether CPS investigated an individual whom JC encountered after being placed in foster care.

The circuit court issued a written opinion and order on March 26, 2015, finding statutory grounds for termination under MCL 712A.19b(3)(b)(*ii*) (failure to prevent injury or abuse), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(j) (reasonable likelihood of harm). The trial court also found that termination was in the best interests of all four children. These appeals ensued.

## II. ANALYSIS

We review an order terminating parental rights for clear error. *In re JK*, 468 Mich 202, 209; 661 NW2d 216 (2003). A decision is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. at 209-210.

Respondent argues that the trial court clearly erred in finding grounds for termination. In order to terminate a respondent's parental rights, the circuit court must find that at least one of the statutory grounds for termination under MCL 712A.19b(3) has been established by clear and convincing evidence. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).

In this case, the court found grounds for termination, in part, under MCL 712A.19(3)(b)(*ii*), which provides that termination is appropriate if the child or a sibling has suffered physical injury or sexual abuse and "[t]he parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home." We have held that "termination of parental rights under [MCL 712A.19b(3)(b)(*ii*)] . . . is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries." *In re Ellis*, 294 Mich App 30, 35-36; 817 NW2d 111 (2011).

In this case, there was substantial evidence that both JC and LC were sexually abused while in respondent's custody, that respondent had an opportunity, yet failed to prevent the abuse, and that there was a reasonable likelihood that all four children would suffer injury, abuse, or harm if returned to respondent's custody. *In re Ellis*, 294 Mich App at 35-36.

There was clear and convincing evidence that JC and LC were sexually abused while in respondent's care. *Id*. The evidence showed that both children engaged in highly-sexualized behavior immediately after being removed from respondent's home. The children's behavior toward each other supported the inference that they were sexually exploited and abused by respondent-father, who, according to respondent, viewed incest pornography. In addition, to their highly sexualized behavior, JC disclosed to caseworkers that her "parent" or "parents" took photographs of her "private parts" and put the photographs on a computer. Although law enforcement did not discover any photographs, JC and LC's behavior, coupled with evidence that respondent-father viewed incest pornography, medical evidence, and other disclosures made by the children, supported that JC and LC were sexually abused while in respondent's care. Specifically, during a forensic interview, JC disclosed that respondent-father, "put his pueter in her vagina" and stated that her parenting time visit went good because respondent-father "didn't poke me in my vagina." JC stated that, in addition to respondent-father, "everybody" penetrated her vagina. JC disclosed that, when respondent-father sexually assaulted her, he placed his hand over her mouth so that she could not scream. Medical evidence supported that JC was sexually abused. In addition, LC disclosed to his foster parent that respondent "sucks on me" and "then the monsters come." On this record, there was clear and convincing evidence that both JC and LC were sexually abused while in the care and custody of respondent. *In re Ellis*, 294 Mich App at 35-36.

Moreover, there was clear and convincing evidence that respondent had the opportunity, yet failed to protect JC and LC from the sexual abuse. *Id*. Medical evidence corroborated JC's allegations of sexual abuse and, despite this evidence, respondent attempted to deflect blame away from respondent-father. Specifically, after suggesting that JC lied about sexual abuse, when respondent learned that JC, then age five, had contracted chlamydia, she showed no emotion and suggested that JC was abused after she was placed in foster care. Indeed, throughout the entirety of the proceedings respondent did not attempt to protect her children, but rather attempted to protect respondent-father by deflecting blame away from him, rationalizing his use of incest pornography and suggesting that CPS failed to investigate other potential perpetrators despite substantial evidence that respondent-father perpetrated the abuse. Furthermore, evidence that neither JC nor LC wanted parenting time with respondent absent

assurances they would not be left with her supported that respondent failed to protect the children while they were in her care. Additionally, LC disclosed to his foster parent that respondent "sucks on me" before "the monsters came." Finally, respondent testified that she was aware that JC exhibits sexualized behavior, yet respondent displayed her complete lack of awareness or lack of concern when she instructed JC, then age five, that she needed to engage in such behavior "in private." On this record, there was clear and convincing evidence that respondent failed to protect JC and LC while they were in her care and custody. *In re Ellis*, 294 Mich App at 35-36.

Finally, there was clear and convincing evidence that there was a reasonable likelihood that all four children would suffer injury or abuse or harm in the foreseeable future if placed in respondent's home. MCL 712A.19b(3(b)(*ii*), (j); *In re Ellis*, 294 Mich App at 35-36. As discussed above, the record shows that respondent displayed a lack of concern about the evidence of sexual abuse. Respondent refused to believe that respondent-father sexually abused two of the children despite the substantial evidence to the contrary, and she testified that if the children were returned to her care, she wanted respondent-father to have contact with them. Respondent's testimony showed that she would stop at no cost to defend respondent-father even at the expense of the safety of her children. She attempted to minimize his behavior, suggesting others may have abused JC, attempted to cast blame onto CPS for the agency's alleged failure to investigate other potential perpetrators, and attempted to rationalize respondent-father's use of incest pornography. Respondent displayed her complete lack of awareness or concern that potential sexual abuse was occurring in the home when she acknowledged observing JC engage in sexualized behavior and then instructing JC, a child, to engage in the behavior "in private." Additionally, McCurdy testified that respondent and respondent-father were "codependent" and that termination was appropriate. Becker also testified that she had no doubt that the children would be harmed if returned to respondent. In short, there was clear and convincing evidence of a reasonable likelihood that all four children would be harmed if returned to respondent. *Id*.

In short, the circuit court did not clearly err in finding clear and convincing evidence to support termination under MCL 712A.19b(3)(b)(*ii*) and (j). Because we conclude that there was clear and convincing evidence to support at least one statutory ground for termination, we need not consider the additional ground upon which the trial court based its decision. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

Respondent also argues that the circuit court erred in concluding that termination was in the children's best interests.

In addition to finding a statutory ground for termination exists, a trial court must also find by a preponderance of the evidence that termination is in a child's best interests. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We review the trial court's decision regarding best interests for clear error. *In re HRC*, 286 Mich App at 459.

The evidence in this case shows that since the time of removal, JC and LC expressed excitement about leaving respondent and showed little to no bond with her or a desire to visit or return to her. JC and LC were afraid to return to respondent's home and before parenting time they needed assurances that they would not be left with their parents. As discussed above, respondent displayed an unwillingness to protect her children from respondent-father, and stated

that she wanted him to have contact with the children despite the evidence of sexual abuse. Moreover, the children were making progress in foster care. Given all of the evidence discussed above, the trial court did not clearly err in finding by a preponderance of the evidence that termination was in in the best interests of all four children. *Id*.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello