*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FRANCES HOTCHKISS and TIMOTHY
HOTCHKISS,

UNPUBLISHED
April 13, 2023

Plaintiffs-Appellees,

v

No. 362370
Wayne Circuit Court
LC No. 21-110135-DC

DIONTE MOORE,

Defendant-Appellant.

Before: CAVANAGH, P.J., and BOONSTRA and RIORDAN, JJ.

PER CURIAM.

Defendant appeals by right the judgment entered by the circuit court granting sole legal and physical custody of the minor child, DM, to plaintiffs Frances Hotchkiss (Frances) and Timothy Hotchkiss (Timothy) (collectively, plaintiffs), the child's maternal grandparents. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In 2014, Erin Hotchkiss (Erin) and defendant began a romantic relationship. At that time, Erin had a daughter, EH, from a previous relationship. In 2015, Erin became pregnant with DM. After DM was born in 2016, defendant signed an acknowledgment of parentage. Also in 2016, Erin sued for custody of DM. In 2017, the circuit court entered a judgment granting Erin sole physical custody of DM and granting Erin and defendant joint legal custody. Defendant was ordered to pay child support and was not permitted to have overnight parenting time.

In 2017, defendant began living with his mother and brother in Dearborn Heights. In the Spring of 2017, while visiting defendant's home with Erin, EH observed defendant snort white powder through a straw. EH subsequently told Frances that she was afraid of defendant. At some point in 2017, Frances moved for and obtained a guardianship over EH. EH moved into plaintiffs' home, but continued to visit Erin's home, where DM lived.

In May 2019, defendant moved for "regular unsupervised parenting time" with DM, and the matter proceeded to a hearing before a referee. During the hearing, Erin presented evidence

that she had obtained a personal protection order against defendant in June 2019, and that defendant had recently been charged with domestic violence and "tampering with a police investigation." The referee found there was an extensive history of domestic violence and that the evidence presented by defendant to support his claim that he had completed domestic violence services was not credible. The referee questioned defendant's credibility and ability to provide DM with a stable, safe environment.

Defendant's parenting time was ultimately suspended. Erin became ill in 2019 and moved into plaintiffs' home with DM; she was ultimately diagnosed with breast cancer. Also in 2019, defendant was ordered to complete a 52-week "batterers intervention program. . . ." as the result of a Children's Protective Services (CPS) investigation. Additionally, in August 2019, defendant moved to revoke his acknowledgment of paternity and for genetic testing regarding DM, alleging that Erin had been unfaithful during their relationship and that DM was not his child. Defendant's paternity was never revoked.

On January 31, 2020, the circuit court ordered that defendant have supervised parenting time with DM for two hours every Saturday. Frances supervised the visits, and she noted that defendant often failed to attend the visits or left early. After the start of the COVID-19 pandemic, defendant was permitted to have supervised visitation with DM in his home. In August 2021, Erin signed an advance directive stating that she wanted DM to remain in plaintiffs' care after her death.

Erin died on August 30, 2021. Defendant did not have visitation with DM through the month of September 2021, although he requested one visitation on September 25, which Frances denied due to already having plans.

In October 2021, plaintiffs petitioned the probate court for, and were granted, temporary guardianship over DM, which would expire on December 2, 2021. Thereafter, plaintiffs filed an emergency complaint for custody in the circuit court. The custody matter was later transferred to the probate court; the circuit court stayed any further proceedings pending the resolution of the probate court matter. Plaintiffs alleged that DM had resided with them for several years, and that defendant was not fit to properly care for DM because of his history of substance abuse, domestic violence, and CPS investigations. Defendant opposed the petition and requested that he be granted sole custody of DM.

In October 2021, defendant began having supervised parenting time visits with DM for one hour, once each week. Elizabeth Bernand, a guardianship specialist from Orchards Children's Services, supervised the visits. Bernand noted that DM seemed unfamiliar with defendant in the beginning. In November 2021, Bernand conducted a guardianship assessment. Bernand ultimately recommended that plaintiffs be granted a full guardianship of DM. She further recommended that defendant be granted parenting time in the community on the weekends.

In May 2022, the custody hearing in the probate court commenced. The parties disputed defendant's level of involvement in DM's life and whether domestic violence had occurred between Erin and defendant. EH and two other witnesses testified at the custody hearing that they had observed defendant physically assault Erin by pushing his forearm against her throat, stomping on her foot, and biting her lip. EH and the other witnesses suspected that defendant had been abusing alcohol and illegal substances. The two other witnesses testified that, after the assault,

defendant threatened several times to kill Erin and DM. EH testified that defendant came to Erin's home at the beginning of 2019 and accused Erin of cheating on him. EH further testified that defendant claimed that DM was not his child; DM was in the room at the time. EH believed that defendant had been drinking. Defendant left after EH threatened to call the police. EH testified to two other altercations between defendant and Erin at her home in 2019. In one altercation, defendant hit Erin with his hands while she was lying on the floor; DM was present in the room at the time. In the other altercation, defendant held a knife to Erin's throat, and left when EH threatened him with her own knife. EH believed that defendant was also intoxicated during both of these altercations.

At the close of the proofs, the probate court took the matter under advisement; it subsequently issued a written opinion outlining the procedural history of the case and the relevant authority concerning a custody dispute between third parties and a biological parent. The probate court discussed the best-interest factors contained in MCL 722.23 and noted that the relevant standard was clear and convincing evidence. The probate court found that eleven of the factors weighed in favor of plaintiffs. It held that DM had an established custodial environment with plaintiffs. It further held that the presumption of parental fitness contained in MCL 722.25(1) had been rebutted by clear and convincing evidence and that custody with defendant was not in DM's best interests. The probate court also held that defendant was entitled to "reasonable parenting time" and ordered that the January 2020 order of the circuit court granting defendant supervised parenting time would remain in effect "until such time as this issue can be addressed by separate motion of the parties."

The circuit court entered a judgment consistent with the probate court's opinion.[1] The judgment granted sole physical and legal custody of DM to plaintiffs, adopted the January 2020 parenting time order by reference, and stated that defendant "shall be entitled to reasonable parenting time upon the hearing on a motion regarding the same." This appeal followed.

## II. CUSTODY DETERMINATION

Defendant argues that the probate court erred by failing to consider whether proper cause or a change of circumstances existed before changing DM's custody, and that it abused its discretion by awarding plaintiffs sole physical and legal custody. While the existing record does not reflect that the probate court explicitly considered proper cause or change of circumstances, any error was harmless. Further, the probate court did not abuse its discretion by awarding plaintiffs sole physical and legal custody of DM.

In custody cases, we apply three standards of review. *Merecki v Merecki*, 336 Mich App 639, 644; 971 NW2d 659 (2021).

> The great weight of the evidence standard applies to all findings of fact. In a child custody dispute, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of

---

[1] The judgment in the circuit court was entered by the same probate judge who issued the opinion in the probate court case, sitting as a circuit court judge under MCL 722.26b(5).

evidence or committed a palpable abuse of discretion or a clear legal error on a major issue. Specifically, [this Court] review[s] under the great-weight-of-the-evidence standard the trial court's determination whether a party demonstrated proper cause or a change of circumstances. A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction. An abuse of discretion standard applies to the trial court's discretionary rulings such as custody decisions. An abuse of discretion, for purposes of a child custody determination, exists when the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. Questions of law are reviewed for clear legal error. A trial court commits legal error when it incorrectly chooses, interprets or applies the law. [*Id.* at 644-645 (quotation marks and citations omitted).]

We defer to trial courts concerning issues of credibility. *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008).

The Child Custody Act, MCL 722.21 *et seq.* (CCA), "governs custody, parenting time, and child support issues for minor children in Michigan, and it is the exclusive means of pursuing child custody rights." *LeFever v Matthews*, 336 Mich App 651, 662; 971 NW2d 672 (2021). The CCA "is equitable in nature and must be liberally construed and applied to establish promptly the rights of the child and the rights and duties of the parties involved." *Id.* (quotation marks and citation omitted). The purposes of the CCA "are to promote the best interests of the child and to provide a stable environment for children that is free of unwarranted custody changes." *Merecki*, 336 Mich App at 645 (quotation marks and citation omitted). "As set forth in MCL 722.27(1)(c), when seeking to modify a custody or a parenting-time order, the moving party must first establish proper cause or a change of circumstances before the court may proceed to an analysis of whether the requested modification is in the child's best interests." *Lieberman v Orr*, 319 Mich App 68, 81; 900 NW2d 130 (2017).

In this case, the May 2017 judgment granted Erin sole physical custody, and it granted Erin and defendant joint legal custody. Plaintiffs sought to modify this judgment because they were requesting sole legal and physical custody of DM. Therefore, plaintiffs were required to make a threshold showing, by a preponderance of the evidence, of proper cause or a change of circumstances occurring after May 2017 before the probate court could "consider whether an established custodial environment exist[ed] . . . and conduct a review of the best[-]interest factors." *Vodvarka*, 259 Mich App at 509.

As stated, the probate court's written opinion does not explicitly indicate that it determined whether proper cause or a change of circumstances existed to warrant modification of the custody arrangement. As will be discussed in Part III of this opinion, the record does not contain the full transcripts of the custody hearing before the probate court; it is therefore possible that the matter was discussed but not recorded. We note also that the record does not indicate that defendant raised an explicit challenge in the probate court on the issue of proper cause or change of circumstances. In any event, to the extent the probate court erred by failing to make such a determination, we conclude that the error was harmless. See MCR 2.613(A).

-4-

"[A] proper cause or change in circumstance is a significant circumstance regarding one or more of the best-interest factors that has the potential for a significant effect on the well-being of the child or children whose custody is at issue." *Merecki*, 336 Mich App at 646 (footnote omitted). More specifically,

> to establish "proper cause" necessary to revisit a custody order, a movant must prove by a preponderance of the evidence the existence of an appropriate ground for legal action to be taken by the trial court. The appropriate ground(s) should be relevant to at least one of the twelve statutory best interest factors, and must be of such magnitude to have a significant effect on the child's well-being. When a movant has demonstrated such proper cause, the trial court can then engage in a reevaluation of the statutory best interest factors. [*Vodvarka*, 259 Mich App at 512.]

To establish a change of circumstances, "the movant must prove by a preponderance of the evidence that since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a significant effect on the child's well-being, have materially changed." *Lieberman*, 319 Mich App at 81-82 (quotation marks and citation omitted). "[T]he evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child." *Vodvarka*, 259 Mich App at 513-514.

At the outset, we note that the parties refer to the January 2020 order, which granted defendant supervised parenting time, when discussing proper cause and a change of circumstances. However, the January 2020 order is not the relevant order. In *Vodvarka*, 259 Mich App at 514, we addressed what evidence may be considered by the court in determining whether a significant change of circumstances has been demonstrated, and explained:

> Because a "change of circumstances" requires a "change," the circumstances must be compared to some other set of circumstances. And since the movant is seeking to modify or amend the prior custody order, it is evident that the circumstances must have changed since the custody order at issue was entered. Of course, evidence of the circumstances existing at the time of and before entry of the prior custody order will be relevant for comparison purposes, but the change of circumstances must have occurred *after* entry of the last custody order. As a result, the movant cannot rely on facts that existed before entry of the custody order to establish a "change" of circumstances. [Footnote omitted.]

As noted, the May 2017 judgment granted Erin sole physical custody, and it granted defendant and Erin joint legal custody. At the time plaintiffs sought custody in 2022, the custody arrangement had not changed since the initial order. While an order was entered in January 2020, only defendant's parenting time schedule changed by virtue of that order. Plaintiffs sought to modify the May 2017 judgment because they were requesting sole legal and physical custody. Applying the analysis of *Vodvarka*, because plaintiffs sought to modify legal and physical custody established by the May 2017 judgment, they were required to demonstrate the circumstances had changed since the time that judgment was entered. See *id.*

The conditions surrounding custody of DM, which have or could have a significant effect on his well-being, materially changed between May 2017 and July 2022. It is undisputed that Erin died in August 2021. Before Erin's death, she had sole physical custody. Ample evidence supports that Erin, as opposed to defendant, provided the vast majority of DM's care after May 2017. When Erin was unable to provide such care directly, she facilitated it through Frances. The death of Erin was not merely a normal life change that accompanied DM's growth and development. Cf. *Gerstenschlager v Gerstenschlager*, 292 Mich App 654, 658; 808 NW2d 811 (2011) ("the fact that a child is growing up, the fact that a child has started high school, and the fact that the child faces scheduling changes related to school and extracurricular activities are the type of normal life changes that occur during a child's life and that do not warrant a change in the child's custodial environment") (quotation marks and citation omitted). DM faced a significant loss in his life, which impacted his emotional health and day-to-day well-being. The changes that resulted from Erin's death are relevant to at least one best-interest factor because her death affected the permanency of DM's family unit. See MCL 722.23(e).

Additionally, Frances testified that defendant missed several parenting time visits (or left early) between January 2020 and October 2021. Frances estimated that defendant had attended 25 parenting time visits with DM during that time. Defendant never requested additional parenting time. While defendant testified that he saw DM on a regular basis before August 2021, the probate court found this testimony to be incredible. *Berger*, 277 Mich App at 705. Additionally, although defendant's parenting time at Orchards Children's Services went well after they began in October 2021, the visits were supervised and occurred once each week for one hour. When the visits began, Bernand observed that DM was unfamiliar with defendant and treated him as a stranger. Defendant also acknowledged that he had not contributed to DM's support since August 2021. Defendant also had not attended DM's medical appointments since 2019, and only occasionally brought him clothes and toys. In sum, ample evidence demonstrated that Erin's death and related circumstances constituted a change of circumstances that warranted revisiting the existing custody order, and any error by the probate court in this respect was harmless.

Moreover, the probate court correctly applied the law and did not abuse its discretion in holding that sole custody of DM by plaintiffs was in DM's best interests. "[A]fter a movant first establishes proper cause or a change of circumstances warranting a change in custody, the trial court must then determine the relevant burden of persuasion before conducting the hearing." *In re Anjoski*, 283 Mich App 41, 54; 770 NW2d 1 (2009). "Generally, if a petition for a change in custody involves a parent and a third party, there is a strong presumption that awarding custody to the parent is in the child's best interests." *Id*. The "presumption is based on parents' fundamental due process liberty interest in the care, custody, and control of their children. The Legislature recognized this interest in MCL 722.25(1). . . ." *Id*. (citations omitted). MCL 722.25(1) provides the following burden of persuasion:

> If a child custody dispute is between the parents, between agencies, or between third persons, the best interests of the child control. If the child custody dispute is between the parent or parents and an agency or a third person, the court shall presume that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is established by clear and convincing evidence. [MCL 722.25(1).]

A third party seeking custody "must establish by clear and convincing evidence that it is not in the child's best interests under the factors specified in MCL 722.23 for the parent to have custody." *Hunter v Hunter*, 484 Mich 247, 265; 771 NW2d 694 (2009). that it was required to consider the best-interest factors enumerated in MCL 722.23, which are:

> (a) The love, affection, and other emotional ties existing between the parties involved and the child.

> (b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

> (c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

> (d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

> (e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

> (f) The moral fitness of the parties involved.

> (g) The mental and physical health of the parties involved.

> (h) The home, school, and community record of the child.

> (i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

> (j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

> (k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

> (l) Any other factor considered by the court to be relevant to a particular child custody dispute. [MCL 722.23.]

Courts "are duty-bound to examine all the criteria in the ultimate light of the child's best interests." *Sinicropi v Mazurek*, 273 Mich App 149, 184; 729 NW2d 256 (2006) (quotation marks and citation omitted). In this case, defendant challenges the probate court's findings as to factors (a), (b), (c), (e), (j), and (k).

With respect to factor (a), the record evidence supports that DM was closely bonded with plaintiffs, who had provided care to him for more than 2½ years of his young life. Frances showed DM affection, and DM referred to Frances as "mom" and "grandma." Although defendant and DM had established a bond by July 2022, the bond was new and formed during defendant's supervised parenting sessions that began in October 2021, which occurred once each week for one hour.

On appeal, defendant argues that the probate court failed to consider evidence that plaintiffs interfered with his relationship with DM, causing their bond to weaken. This argument is not supported by the evidence. Defendant testified at the custody hearing that he and Erin "went their separate ways in 2018," and that DM and Erin moved into plaintiffs' home in 2019. Defendant was permitted to have supervised parenting time, and Frances supervised the visits. Testimony supported that defendant missed parenting times and never requested additional parenting time even though plaintiffs had an "open door policy." Defendant also failed to attend DM's extracurricular activities despite being permitted to do so. While defendant testified that he saw DM on a regular basis before August 2021, the probate court found this testimony to be incredible, and this Court defers to the probate court, as a trial court, concerning issues of credibility. *Berger*, 277 Mich App at 705. Defendant himself agreed that plaintiffs did not deny him access to DM. The probate court's finding that factor (a) weighed heavily in favor of plaintiffs was not against the great weight of the evidence.

With respect to factor (b), the evidence supports plaintiffs had a greater capacity to provide DM with "guidance and to continue the education and raising of the child in his or her religion or creed. . . ." Frances had enrolled DM in counseling to help him cope with grief surrounding Erin's death, and Bernand opined that plaintiffs were a better support system than defendant. When DM began to live with plaintiffs in 2019, he had difficulty speaking and had disciplinary issues. Frances worked with DM on his speech and enrolled him in preschool. As of May 2022, DM's speech had improved and he was doing well in school. Plaintiffs took DM to school together, and Frances assisted DM with homework. There was also an educational space in the home, which contained maps and other learning materials. Plaintiffs took DM to church on a regular basis, and ensured that he socialized with other children. Defendant did not engage in these activities with DM. While defendant argues on appeal that plaintiffs interfered with his ability to engage in DM's education, the record supports that defendant did not seek to actively participate in DM's education. Indeed, defendant testified that he did not know what school DM attended, despite being shown his report card. The probate court's finding that factor (b) weighed heavily in favor of plaintiffs was not against the great weight of the evidence.

With respect to factor (c), the evidence supports that plaintiffs had the capacity and disposition to provide for DM's material and medical needs. Plaintiffs began to care for DM in 2019. They provided him with food, clothing, housing, and medical care. Plaintiffs also ensured that DM had health insurance and ensured that his educational needs were met. The record shows that defendant often resisted paying child support. In August 2019, defendant attempted to revoke his acknowledgment of paternity. Defendant admitted that he did not pay child support after August 2021. While defendant testified that plaintiffs told him it was unnecessary to do so, Frances testified this statement was made because defendant would become hostile when child support was mentioned. This was the case even though defendant claimed to earn $80,000 per year and to only pay $500 each month in living expenses. Moreover, if plaintiffs had refused to accept support,

defendant could have notified the court or set the support payments aside in an account for DM, but did not do so. Defendant did not insure DM under his health insurance plan, and was unable to estimate how many medical appointments he had attended with DM. Although defendant blames plaintiffs for his lack of involvement in DM's medical care, the probate court heard evidence that defendant had been banned from the pediatrician's office for aggressive behavior. The probate court's finding that factor (c) weighed heavily in favor of plaintiffs was not against the great weight of the evidence.

With respect to factor (e), plaintiffs owned their home, which was "paid off." DM had lived with them since 2019, and he had his own room. EH also lived in the home, and she was very bonded with DM. See *Kubicki v Sharpe*, 306 Mich App 525, 543; 858 NW2d 57 (2014) ("Factor (e) requires a court to weigh all the facts bearing on which parent likely can best provide the child the benefits of a custodial home that is marked by permanence, as a family unit.") (quotation marks and citation omitted). Defendant testified that he had lived in the same home since 2017, paying rent to his mother. Bernand had noted that DM did not have his own room in the home, and the home was not child friendly. Although defendant argues that his living environment was stable and only a cursory assessment of the home was performed, the probate court was entitled to find Bernand's testimony credible. *Berger*, 277 Mich App at 705. The probate court's finding that factor (e) weighed heavily in favor of plaintiffs was not against the great weight of the evidence.

With respect to factor (j), defendant argues that evidence supports that plaintiffs were unwilling to foster a relationship between him and DM. We disagree. DM and Erin moved into plaintiffs' home in 2019. Beginning in January 2020, Frances supervised defendant's parenting times with DM. Defendant often missed parenting times or left early. After the COVID-19 pandemic, Frances permitted defendant to have parenting times with DM at defendant's home. Defendant never requested additional parenting time with DM even though plaintiffs had an "open door policy." Defendant also failed to attend DM's extracurricular activities and was not able to attend pediatrician appointments. While defendant testified that he saw DM on a regular basis before Erin's August 2021 death, the probate court found this testimony to be incredible. *Berger*, 277 Mich App at 705. Again, defendant himself agreed plaintiffs did not deny him access to DM, and Frances testified that it was important for a child to have a relationship with his or her father. The probate court's finding that factor (j) weighed heavily in favor of plaintiffs was not against the great weight of the evidence.

With respect to factor (k), testimony supports the conclusion that defendant assaulted Erin while she was pregnant and on numerous occasions in the presence of DM. Testimony also supports the conclusion that defendant threatened to kill Erin and DM. When defendant testified at the custody hearing, he flatly denied the evidence of his past domestic violence, accusing the testifying witnesses of lying. Although defendant completed a 52-week "batterers intervention program," he was unable to name the program or explain what he had learned. Defendant argues on that the probate court improperly considered the August 2019 referee recommendation when making findings under factor (k), and also failed to properly weigh his testimony that he had stopped abusing alcohol and controlled substances. We disagree. Defendant argues that the referee's findings from 2019 were inadmissible without the stipulation of the parties; the record shows that the findings *were* admitted by stipulation of the parties. And the probate court was permitted to weigh the evidence of defendant's current sobriety against the evidence that defendant

had often been physically violent and threatening to DM's mother while DM was present, and had was either unable or unwilling to take responsibility for his past conduct. The probate court's finding that factor (k) weighed heavily in favor of plaintiffs was not against the great weight of the evidence.

Eleven of the best-interest factors weighed in favor of plaintiffs. While defendant argues that the probate court placed improper weight on the fact that Erin had executed an advance directive, there is no indication from the record that the probate court gave this one piece of evidence undue weight when it made its factual findings. The probate court did not abuse its discretion when it found that clear and convincing evidence overwhelmingly favored granting custody to plaintiffs. *Merecki*, 336 Mich App at 644.

## III. DUE-PROCESS CLAIMS

Defendant argues that the probate court violated his right to due process by refusing to consider parenting time before terminating its jurisdiction. Defendant also argues that his due-process rights were violated because portions of the custody hearings could not be transcribed and because there was a delay in the production and filing of the transcripts. We disagree with both arguments.

## A. PARENTING TIME

Defendant first argues that the probate court violated his right to due process by refusing to consider parenting time before terminating its jurisdiction. According to defendant, the probate court's failure to decide whether defendant was entitled to unsupervised parenting time in its July 2022 opinion caused him to be "deprived of nearly five months of non-supervised parenting time and to incur substantial additional costs related to filing and litigating" a separate motion for parenting time in the circuit court. We disagree. The probate court's opinion was not silent as to parenting-time; rather, the probate court held that the existing parenting-time order would continue unless a party sought to change it. The record shows that the parties extensively discussed defendant's parenting-time history. Defendant essentially argues that, because the probate court did not order unsupervised parenting time, he was forced to file a separate motion seeking it, in violation of his due process rights. Defendant's argument that being required to file a separate motion to seek a change in parenting time was a constitutional violation is unpreserved and we decline to consider it. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008), *In re Conservatorship of Murray*, 336 Mich App 234, 240; 970 NW2d 372 (2021) (noting that issues raised for the first time on appeal in a civil case are not ordinarily subject to review). Apart from that argument, it appears simply that defendant disagrees with the probate court's determination to continue the existing parenting-time order or failure to order unsupervised parenting time. Defendant makes no specific argument that the probate court's determination was not in DM's best interests. See MCL 722.27a; *Shade v Wright*, 291 Mich App 17, 28-29; 805 NW2d 1 (2010). Accordingly, we find no error requiring reversal.

## B. TRANSCRIPTS

Defendant also argues that his right to due process was violated because only a portion of the custody hearings could be transcribed and because there was a delay in the production of the

transcripts. We disagree. While plaintiffs are correct that these arguments were raised for the first time on appeal, they are, by their nature, arguments that could only be raised for the first time on appeal. We conclude that it is proper to treat these arguments as preserved. See MCR 7.216(A)(7) (this Court may "enter any judgment or order or grant further or different relief as the case may require"). "This Court . . . reviews de novo questions of constitutional law." *Bailey v Antrim Co*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357838); slip op at 4.

"Parents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process." *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003). "Due process is a flexible concept, the essence of which requires fundamental fairness. The basic requirements of due process in a civil case include notice of the proceeding and a meaningful opportunity to be heard." *Al-Maliki v LaGrant*, 286 Mich App 483, 485; 781 NW2d 853 (2009) (citations omitted).

This Court has held that the inability to obtain a complete transcript of the proceedings may so impede a criminal defendant's constitutional right to appeal as guaranteed by Const 1963, Art 1, § 20, that a new trial must be ordered. *People v Audison*, 126 Mich App 829, 834-835 (1983); 338 NW2d 235 (1983); *People v Horton (After Remand)*, 105 Mich App 329, 331; 306 NW2d 500 (1981); *People v Drew*, 26 Mich App 337, 341; 182 NW2d 566 (1970). Regarding the failure to transcribe a complete record in civil cases, in *Elazier v Detroit Non-Profit Housing Corp*, 158 Mich App 247, 248; 404 NW2d 233 (1987), this Court stated:

> [W]hether the right to appeal is derived from the constitution or statute, we believe that, before a court grants a new trial based upon a failure of the transcription process, it must determine that the existing record and any possible settlement or reconstruction of the record is insufficient to allow evaluation of the specific allegations of error. [*Id*. at 249-250.]

Defendant argues that his right to due process was violated because portions of the transcripts were unable to be transcribed, for reasons that are unclear from the record. Specifically, the testimony of Timothy, as well as that of Bernand's supervisor, was not able to be transcribed. But defendant does not explain how it is impossible for this Court to review the proceedings because of the missing portions of transcript. The testimony of six other witnesses, including EH, Frances, and defendant was transcribed. This Court was therefore able to review a majority of the testimony. Given the facts of this case, the most important and relevant testimony was transcribed, and the existing record is adequate to fully review the allegations of errors raised by defendant on appeal. Upon review of the July 18, 2022 opinion, it does not appear the probate court heavily relied on the missing testimony.[2] Defendant is not entitled to a new custody hearing based solely on missing portions of the transcript.

---

[2] It appears from plaintiff's closing arguments that Timothy testified regarding plaintiffs' financial stability, and that Bernand's supervisor testified to running a criminal background check on defendant and plaintiffs. Plaintiffs' financial stability and the criminal records of the parties were not the subject of extensive factual dispute at the custody hearing; for example, plaintiffs did not

Defendant also argues that the probate court violated his due-process rights "by delaying the production of recordings of the evidentiary hearings in this action by more than three months." While defendant is correct there was a delay in locating the transcripts and in the transcripts being filed, we fail to see how this can be attributed to the probate court. It appears there was confusion regarding where to locate certain recordings because of the number of actions that had been filed and because of the transfer of the custody matter to the probate court. Additionally, while there appear to have been delays in transcribing the proceedings, the transcriptionist is an independent third party—not a governmental actor. See *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 213; 761 NW2d 293 (2008) ("[w]e have emphasized time and again that [t]he touchstone of due process is protection of the individual against arbitrary action of government) (second alteration in original; quotation marks and citations omitted). See also *id.* at 213 ("Procedural due process serves as a limitation on governmental action and requires a government to institute safeguards in proceedings that might result in a deprivation of life, liberty, or property.").

Affirmed.

/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra
/s/ Michael J. Riordan

---

dispute that Timothy was convicted of driving under the influence 47 years ago, nor did defendant dispute that he was charged with domestic violence against Erin in 2018, which charges were later dismissed.