*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J. H. KIRTLEY, Minor.

UNPUBLISHED
August 12, 2025
2:18 PM

No. 373761
Oakland Circuit Court
Family Division
LC No. 2022-884675-NA

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

PER CURIAM.

Respondent-father appeals as of right the order terminating his parental rights to his minor child, JHK. Respondent-father pled no contest to the facts establishing jurisdiction and statutory grounds for termination under MCL 712A.19b(3)(b)(*i*) (physical injury or physical or sexual abuse of the child or a sibling), (k)(*ii*) (criminal sexual conduct involving penetration), and (k)(*ix*) (sexual abuse). The trial court held a hearing and found by a preponderance of the evidence it was in JHK's best interests to terminate respondent-father's parental rights. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

JHK was born to respondent-father and his wife ("mother"), a nonrespondent, in April 2021. Mother also has a daughter, ARH, and a son, AH, from another relationship. ARH and AH are respondent-father's stepchildren. Respondent-father, mother, and the three children lived together in a home in Pontiac.

### A. EVENTS LEADING TO CRIMINAL PROSECUTION

ARH alleged respondent-father began sexually abusing her before JHK was born and that sometime in 2021, respondent-father "performed oral sex on" ARH in the basement of the family home. In June 2022, when ARH was 10 years old, respondent-father "digitally penetrated [ARH's] vagina with his fingers." JHK was in the home during this 2022 incident. Law enforcement and Children's Protective Services (CPS) were notified, ARH received a forensic interview, and respondent-father was interviewed by a police detective. Mother, ARH, and AH were also

-1-

interviewed. After these interviews, respondent-father was arrested, held in the Oakland County Jail, and criminally charged with one count of first-degree criminal sexual conduct ("CSC-I"), MCL 750.520b, and one count of second-degree criminal sexual conduct ("CSC-II"), MCL 750.520c. The court issued a no-contact order between respondent-father and ARH only, and after serving 43 days in jail, respondent-father was released on a personal bond with a tether.

In July 2022, petitioner, the Department of Health and Human Services (DHHS), sought to terminate respondent-father's parental rights to JHK based on anticipatory neglect, alleging that remaining in the home with respondent-father presented a substantial risk of harm to JHK's life, physical health, and mental well-being because of respondent-father's sexual abuse of ARH. DHHS requested the trial court (1) authorize the petition, (2) remove the child from respondent-father's care, (3) suspend respondent-father's parenting time, (4) exercise jurisdiction over JHK, and (5) find statutory grounds for termination under MCL 712A.19b(3)(b)(*i*), (k)(*ii*), and (k)(*ix*). The petition alleged respondent-father was criminally charged with CSC-I and CSC-II. The petition also stated that reasonable efforts were made to prevent JHK from being removed.

The trial court authorized the petition, determined respondent-father would not be allowed to return to the family home upon his release from jail, allowed JHK to remain living in the family home with his mother, and suspended respondent's parenting time with JHK per the appointed lawyer-guardian ad litem's (LGAL's) recommendation because of the CSC charges. No plan for reunification was created and respondent-father was not offered treatment or services from DHHS.[1] ARH was offered and attended counseling, and DHHS indicated it could assist mother. The hearing to establish jurisdiction and statutory grounds in the family court were adjourned until the resolution of the criminal proceedings.

From August 2022 until his trial in the criminal case, respondent-father was out on a personal bond with a tether and living with his brother. Respondent-father violated the no-contact order as to ARH and the order suspending parenting time as to JHK.[2] Respondent-father saw JHK in early 2024 while mother was working making deliveries for Door Dash—JHK and respondent-father rode in the backseat on two or three occasions while mother was driving. Respondent-father

---

[1] Reasonable efforts to reunify the child and family must be made in all cases except those involving the circumstances delineated in MCL 712A.19a(2), including cases where a judicial determination has been made that the parent has subjected the child to "aggravated circumstances." MCL 712A.19a(2)(a). Aggravated circumstances include situations where DHHS has determined a parent residing in the child's home has subjected the child *or a sibling of the child* to CSC involving penetration, as was the case here. MCL 722.638(1)(a)(*ii*).

[2] Respondent-father testified that mother brought him lunch to his workplace "four or five" times, and that ARH was in the car with her. This "upset" him because he knew he was not supposed to be around ARH.

testified that after his parenting time was suspended, he saw JHK "multiple times, every couple months," and mother was usually present,[3] but JHK never stayed with respondent-father overnight.

In July 2024, respondent-father was convicted of three counts of CSC-I and one count of CSC-II, and was sentenced to 25 to 50 years' imprisonment for each CSC-I conviction and 10 to 15 years' imprisonment for the CSC-II conviction.[4]  His earliest release date is July 8, 2049. Family court proceedings resumed following his conviction and sentence.

## B. FAMILY COURT PROCEEDINGS LEADING TO TERMINATION OF RESPONDENT-FATHER'S PARENTAL RIGHTS TO JHK

Also in July 2024, after his criminal trial, respondent-father entered a no contest plea to the facts establishing jurisdiction and statutory grounds for termination of parental rights in this case. The trial court advised respondent-father of his rights and he affirmed his understanding of those rights.  A DHHS representative, Natalie Weber, then testified to the facts establishing jurisdiction and statutory grounds: that respondent was convicted of three counts of CSC-I and one count of CSC-II for "oral sex" with and "digital penetration" of ARH.  The trial court accepted respondent-father's plea and found by a preponderance of the evidence there were statutory grounds to exercise jurisdiction over JHK, and by clear and convincing evidence there were statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (k)(*ii*), and (k)(*ix*).  By this time, JHK was three years old.

The trial court held an evidentiary hearing on best interests on October 15, 2024.  Mother and respondent-father were still married at this time.  DHHS caseworker Jeff Simon testified that he was assigned this case in July 2023 and visited JHK each month; Simon stated mother was employed and there were no concerns with the home she provided to the ARH, AH, and JHK. JHK's needs were met and he was "progressing as normal," did not have special needs or unique medical needs, was attending all doctor's appointments as scheduled, and attended daycare.  Simon testified that DHHS had no concerns about JHK remaining in mother's care.  Simon met respondent-father once inside the courthouse, never observed respondent-father with JHK, and opined JHK was too young to express a preference for continuing to see respondent-father.  Other than their courthouse meeting, Simon attempted to reach respondent-father via home visits, phone calls, and texts but never got a response.  Simon also testified that the last time respondent-father spent time with JHK was in June 2022, when JHK was around 14 months old.  Simon also stated that JHK never asked about respondent-father, but attributed this to JHK's youth.  Simon was unaware whether respondent-father provided financially for JHK, and opined termination was in JHK's best interests because of respondent-father's CSC convictions and JHK's youth.

---

[3] When asked whether JHK was ever solely in his custody during this time, respondent-father stated only for "about ten minutes at time . . . ."

[4] The multiple convictions were the result of consolidated cases in Oakland County Circuit Court. In case number 2022-282728-FC, respondent-father was found guilty by a jury of one count of CSC-I and one count of CSC-II on July 12, 2024.  In case number 2023-283625-FC, on July 12, 2024, a jury found respondent-father guilty of two counts of CSC-I.

Respondent-father also testified at the best interests hearing, admitting that he violated the trial court's order when he saw JHK after his parenting time was suspended. Respondent-father demonstrated he knew JHK's favorite activities and foods. Before JHK was removed from respondent-father's care, he testified he "paid for all [JHK's] stuff. I took him to doctor's appointments . . . potty trained him, everything that a father does." After his parenting time was suspended, respondent-father testified he continued providing for JHK financially. "I bought all his clothes, I paid for all his food. Everything that he needed[,] I bought. All of his Christmas gifts. Everything was coming from me." Respondent-father testified JHK called him "dad" and the two had a strong bond, stating:

> Every time I saw him, he jumped in my arms and held me. And he would not let go [un]til his mother told him to. And I give him hugs and kisses every time I saw him. And he was—he would not let me put him down until it was time for me to go . . . video calls seven days a week, multiple times a day. He loved to talk to me on those, too.

Respondent-father also testified he had three siblings, and JHK's mother allowed JHK to visit respondent-father's siblings a few times. Finally, respondent-father acknowledged JHK would be 28 years old by the time he is released from prison and that he could not provide any permanency and stability in JHK's life presently. He testified that he believed JHK would suffer if denied contact with him, and that he would like to see JHK while incarcerated.[5]

JHK's paternal grandmother also testified that respondent-father saw JHK once a week while he was out on a personal bond, and she observed an interaction between the two wherein JHK jumped into respondent-father's arms when they saw each other. JHK's grandmother also stated mother does not want to divorce respondent-father, but will not cooperate in allowing JHK to spend time with respondent-father's family members. Respondent-father lived with his brother from the time ARH came forward about her assaults until his incarceration. The brother testified respondent-father saw JHK in person, through video calls, and at parks and arcades, that JHK was excited to see his father, and that they shared a strong bond.[6]

Finally, an expert psychologist, Dr. Douglas J. Park, testified on behalf of respondent-father. Dr. Park reviewed ARH's forensic interview and confidential reports from DHHS. Dr. Park testified about forensic interviewing protocol, and noted ARH was not informed she was being recorded until the end of her forensic interview. She should have been informed at the start of the interview as per mandated protocol in Michigan. Dr. Park also opined that during the forensic interview, ARH was very eager to please the examiner and answer the questions posed. He suggested that ARH's allegations may have stemmed from anger and resentment toward

---

[5] When asked why he had not divorced from JHK's mother, respondent-father testified he had not "had the opportunity" to. He also stated he had a 401(k) from his last employer, PepsiCo, and without permission, mother had attempted to gain access to his funds by logging into the account to change his beneficiary statuses.

[6] The brother also testified mother took out a $400,000 life-insurance policy in respondent-father's name a few months before his trial in the criminal case.

respondent-father for having a child in common with mother. Dr. Park also suggested ARH could have been influenced by her mother, who was hyper-vigilant about her children being abused, and may have led ARH to say things that were untrue.

After the hearing, the trial court took the matter under advisement and later entered an order and opinion finding by a preponderance of the evidence that termination of respondent-father's parental rights was in JHK's best interests. Specifically, the court found that there was no convincing evidence of a strong bond between respondent and JHK. The court noted JHK was 18 months old when respondent-father's parenting time was suspended, and three years old when respondent-father was convicted and sentenced to a minimum of 25-years' imprisonment. The court opined that respondent-father's testimony was "not indicative of supporting a strong bond" between him and JHK. The court found the lack of a strong bond favored termination.

As for parenting ability, the trial court acknowledged that although there was no evidence to suggest respondent-father abused JHK, respondent-father was criminally convicted of sexually abusing JHK's half-sibling. The court reasoned that because respondent-father did not express remorse for abusing ARH, JHK would be at risk of harm in respondent-father's care because JHK was reaching the age ARH was when the sexual abuse against her began. The court opined that because of his abuse of ARH, respondent-father lacked the ability to parent JHK, which weighed in favor of termination.

The trial court also reasoned respondent-father was unable to provide JHK with permanence, stability, and financial support within a reasonable time because he was incarcerated, and would be until, at his earliest release date, JHK is 28 years old. The court opined this favored termination. As for visitation history, the court stated "[r]espondent-[f]ather's parenting time with [JHK] has always been suspended. This factor weighs in favor of termination."

As for the advantages of foster care, the trial court deemed this factor inapplicable because JHK was living with mother and doing well in her care. The trial court also found considering a history of domestic violence inapplicable because there was no evidence of domestic violence between JHK's parents or against JHK. Respondent-father's compliance with a treatment plan was deemed an inapplicable factor because the presence of aggravating circumstances meant DHHS was not required to provide any treatment or services. The potential for adoption was also deemed an inapplicable factor because mother's parental rights had not been terminated. The trial court stated that because JHK was doing well in mother's care and was generally happy, this factor weighed in favor of termination.

Next, the trial court explicitly recognized that JHK was in relative placement with his mother and was doing well in her care. The court also recognized that relative placement typically weighs against termination. However, the court found this presumption was:

> outweighed by the sexual abuse of [JHK]'s half-sibling and significant concern for [JHK's] on[]going safety and the success he is experiencing while in relative care. . . . While the court understands the rationale behind the presumption against termination that relative placement brings to the table, [JHK]'s need for protection from [r]espondent-[f]ather is more adequately assured by terminating [r]espondent-[f]ather's rights than by maintaining those rights.

Finally, the trial court noted the LGAL and Simon recommended termination was in JHK's best interests. The trial court found termination was in JHK's best interests, and entered an order terminating respondent-father's parental rights to JHK. This appeal followed.

## II. TERMINATION IS IN JHK'S BEST INTERESTS

Respondent-father contends it was not in JHK's best interests for the trial court to terminate his parental rights. He argues there should be no concern for anticipatory abuse or neglect where he is incarcerated and will not be released until JHK is 28 years old. We disagree.

## A. STANDARD OF REVIEW

"We review for clear error the trial court's determination of best interests." *In re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. (quotation marks and citation omitted). "Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *Id*. (quotation marks and citation omitted).

## B. BEST-INTEREST FACTORS

"Even if the trial court finds that the [petitioner] has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Sanborn*, 337 Mich App at 276 (quotation marks and citation omitted). "In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party." *Id*. (quotation marks and citation omitted). "[T]he child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home, are all factors for the court to consider when deciding whether termination is in the best interests of the child." *Id*. at 276-277 (quotation marks and citation omitted). "The trial court may also consider the child's age, inappropriate parenting techniques, and continued involvement in domestic violence." *Id*. at 277. "It may further consider visitation history, the parent's engaging in questionable relationships, the parent's compliance with treatment plans, the child's well-being in care, and the possibility of adoption." *Id*.

"Parents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process." *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003). Yet, "the focus at the best-interest stage has always been on the child, not the parent." *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013).

Having reviewed the record, we conclude the trial court did not clearly err.

## 1. THE BOND BETWEEN RESPONDENT-FATHER AND JHK

JHK was 18 months old when he was removed from respondent-father's care and parenting time was suspended. Respondent-father and his family members testified about the relationship

between him and JHK. Testimony revealed that before removal, JHK called respondent "dad," and they played together. Between the time JHK was removed and respondent-father was incarcerated, the two saw each other every few weeks and participated in video calls every day. Respondent-father knew JHK's favorite foods and activities, and stated that JHK "jump[s] in [respondent's] arms." JHK's maternal grandmother opined JHK and respondent-father shared a bond. Respondent-father's brother also believed JHK and respondent had a "strong" bond, noting that JHK was always "excited to see" respondent-father.

However, Simon testified that the last time the two spent time together was in June 2022 before JHK was removed. And, when Simon asked mother whether JHK ever mentioned or asked about respondent-father, mother confirmed JHK did not ask for or about him. Simon attributed this to JHK's youth, and stated JHK was too young to express a preference about having a relationship with respondent-father. On the basis of these facts, the trial court did not err in finding it was not presented with convincing evidence of a strong bond between JHK and respondent-father.

## 2. RESPONDENT-FATHER'S PARENTING ABILITY AND JHK'S NEED FOR STABILITY

Next, the trial court opined that although there is no evidence to suggest respondent-father abused JHK, the fact respondent-father was convicted of CSC against JHK's sibling, and one of the instances of CSC occurred while JHK was in the home, demonstrated that JHK's safety and well-being would be at risk in respondent-father's care. The trial court relied on the doctrine of anticipatory neglect, which "recognizes that [h]ow a parent treats one child is certainly probative of how that parent may treat other children." *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020) (citation omitted).

This Court has upheld an order terminating parental rights for similar reasons in a case with less egregious facts. In *In re Mota*, 334 Mich App 300, 304; 964 NW2d 881 (2020), the respondent-father sexually abused his minor children's half-sister, also a minor, by taking photographs of her anal and vaginal openings while she pretended to be asleep. The half-sister lived with the respondent-father, was bonded to him, and looked to him as a father. Even without a CSC conviction, the trial court found statutory grounds existed, and terminated the respondent-father's parental rights to his biological children. The trial court found termination was in their best interests even where the children were strongly bonded to their father because "the children needed stability and permanence, as well as to grow up in an environment where they are safe and secure[] from . . . potential victimization . . . ." *Id*. at 322 (cleaned up). In affirming the order terminating the respondent-father's rights, this Court reasoned even though the respondent-father only committed one act of sexual abuse, it revealed a side of him that posed a serious danger to his own children. *Id*. at 322-323. This Court concluded:

> Furthermore, there is nothing in the record to support respondent[-father]'s pseudo-psychological argument that he is not a danger to young boys—abuse is abuse. Finally, the fact that respondent provided some limited assistance to his children did not suffice to overcome the danger that respondent poses to his children. In sum, the trial court did not clearly err by finding that termination of respondent's parental rights was in the best interests of the children. [*Id*. at 323.]

Applying the principles from *In re Mota* here, respondent-father and ARH lived together for several years and he abused his position of trust to sexually abuse her. We conclude that the trial court did not clearly err in determining respondent-father's CSC convictions against JHK's half-sister indicates he lacks the ability to safely parent his biological son.

Regarding JHK's need for permanence and stability, respondent-father did not present evidence of his contributions to JHK's permanence and stability prior to incarceration, only conclusory statements about prior financial assistance he provided. And, respondent-father and his testifying family members did not offer anything to counter the trial court's conclusion that decades of incarceration would wholly impede respondent-father's ability to provide permanence and stability. Further, respondent-father's opinion that JHK would suffer if denied contact is superseded by the possibility that JHK could be abused if he were allowed contact with respondent-father, even if this likelihood is lessened by the fact of respondent-father's incarceration. The trial court's reliance on the doctrine of anticipatory neglect to conclude respondent-father's lack of parenting ability weighed against termination was not clearly erroneous. *In re Kellogg*, 331 Mich App at 259.

## 3. RELATIVE PLACEMENT

Regarding relative placement weighing against termination, the trial court acknowledged:

> A child's placement with relatives is a factor that the trial court is required to consider. Placement with a relative weighs against termination, but that fact is not dispositive given that a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests[.] [*In re Atchley*, 341 Mich App 332, 347; 990 NW2d 685 (2022) (quotation marks and citations omitted).]

Under MCL 712A.13a(1)(j)(*i*), a relative now includes an adult "[r]elated to the child within the fifth degree by blood, marriage, or adoption. . . ." which includes a biological parent. *In re Boshell/Shelton*, ___ Mich App ___, ___; ___ NW3d ____ (2025) (Docket No. 371973), slip op at 10.

Here, the trial court stated JHK's was in relative placement with his mother and this "typically weighs against termination." The trial court considered JHK's well-being with mother and found he was "doing well." The evidence established JHK was healthy, having his needs met, and was "progressing as normal." The trial court went on to find placement with mother was "outweighed by the sexual abuse of the child's half-sibling and significant concern for [JHK's] on[]going safety and the success he is experiencing while in relative care." Such balancing is permissible. See *In re Schadler*, 315 Mich App at 412 (holding the trial court did not err where it acknowledged relative placement was outweighed by the sexual abuse committed against the child). The trial court did not clearly err in holding JHK's placement with mother was outweighed by the danger posed to JHK if allowed further contact with respondent-father.

## 4. FACTORS THE TRIAL COURT DEEMED INAPPLICABLE

The trial court found that "the advantages of foster care over the parent's home," "parent's history of domestic violence," and "the possibility of adoption" were "inapplicable" to the question

of whether respondent-father's rights should be terminated. Respondent-father instead argues these considerations were applicable and weighed against termination. First, we disagree with respondent- father as to most of these categories because the trial court properly considered JHK's placement. Second, we note that the trial court could have found domestic violence supported termination, rather than deeming this factor "inapplicable," and so this finding ultimately helped respondent-father. MCL 400.1401(d)(i) defines domestic violence as causing physical or mental harm to, or engaging in involuntary sexual activity by force with, a family or household member, which includes a spouse's minor child. The evidence of domestic violence present in this case were respondent-father's CSC convictions involving ARH, the child of his spouse. Thus, there was evidence of domestic violence on this record, which could have weighed in favor of termination rather than being inapplicable as the trial court found.

## III. CONCLUSION

The trial court did not clearly err by finding terminating respondent-father's parental rights was in JHK's best interests.

Affirmed.

/s/ Adrienne N. Young
/s/ Anica Letica
/s/ Daniel S. Korobkin