*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* N. L. BENNETT, Minor.

UNPUBLISHED
January 22, 2026
2:45 PM

No.  374624
Wayne Circuit Court
Family Division
LC No.  2018-001318-NA

Before:  RIORDAN, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Respondent-mother appeals as of right the order terminating her parental rights to NLB under MCL 712A.19b(3)(j) (reasonable likelihood of harm if child is returned to parent).[1]  We affirm.

## I.  FACTS

This matter has a lengthy history predating NLB's birth.  Respondent-mother has nine children, several of whom were at issue in these proceedings.  However, the only child at issue for purposes of this appeal is respondent-mother's youngest child, NLB.  NLB was four years old at the time of termination.

The court removed NLB from respondent-mother's care shortly after her birth because respondent-mother tested positive for cocaine while pregnant with the child.  Respondent-mother made progress with her parent-agency agreement, and NLB was returned to her care over a year later.  However, more allegations surfaced against respondent-mother regarding her treatment of another child, and the court exercised jurisdiction over the children but did not remove them initially.

Although respondent-mother once again made progress, NLB and several of her siblings were removed from the home in August 2023 after allegations surfaced that respondent-father inappropriately touched and made a sexual remark to respondent-mother's adolescent daughter from a prior relationship,

---

[1] Respondent-father's parental rights to NLB were terminated in the same proceeding.  However, respondent-father has not appealed the order terminating his parental rights.

-1-

BLS. According to petitioner, the Department of Health and Human Services (DHHS), respondent-mother learned of the allegations but did not report the incident to the police, despite several instructions by DHHS to do so. She also continued to live with respondent-father even after learning about the allegations. DHHS sought termination of both respondents' parental rights.

During the subsequent termination proceedings, respondent-mother revealed that she voluntarily surrendered NLB to NLB's foster parents from her first removal before DHHS filed the August 2023 petition, which she attributed to issues with her housing and the ongoing behavioral issues of another adolescent child, DID. A bifurcated termination hearing occurred before a referee. After a four-day hearing, the referee found that a statutory ground existed under MCL 712A.19b(3)(j) to terminate respondent-mother's parental rights to NLB and several of her siblings. The referee also found that statutory grounds existed to terminate respondent-father's parental rights to NLB. The trial court accepted the referee's recommendations and entered an order finding statutory grounds existed for termination.

A separate best-interest hearing occurred over a three-day period in the latter half of 2024. Respondent-mother acknowledged she had not visited NLB since November 2023. The visitations resumed in October 2024 after a new DHHS caseworker was assigned to the matter. Respondent-mother attributed the visitation issues to her prior DHHS caseworker, Jessica Jackson, while Jackson attributed the issues to respondent-mother's failure to confirm the visits beforehand.

Respondent-mother was homeless throughout the period of the best-interest hearings. Although she was no longer living with respondent-father, she did not have her own place to live. She testified that she was working on a program to take the General Educational Development (GED) test and earned income through Social Security benefits, which she acknowledged was not enough to support herself and her children. Respondent-mother testified that she was clean from drugs and ended her relationship with respondent-father before the best-interest proceedings started.

Meanwhile, NLB remained in the care of her foster parents. By all accounts, NLB was thriving and was very bonded to her foster parents. The foster parents wanted to adopt her but were not interested in a guardianship. NLB's lawyer-guardian ad litem (L-GAL) advocated that termination of respondent-mother's parental rights was in NLB's best interests, although it was not in the best interests of respondent-mother's older children to terminate her rights to those children. The referee found that termination was, by a preponderance of the evidence, in NLB's best interests considering that respondent-mother still lacked suitable housing and a legal source of income and considering NLB's age. However, the referee found that termination was not in the best interests of the older children. The trial court adopted the referee's recommendation and terminated respondent-mother's parental rights to NLB, only.

## II. DISCUSSION

On appeal, respondent-mother argues that the trial court erred by terminating her parental rights to NLB because the record supported that respondent-mother's situation was improving by the best-interest hearings, and the court should have ruled that NLB was similarly situated to her older siblings. We disagree.

Respondent-mother does not challenge that a statutory basis existed to terminate her parental rights to NLB. Therefore, our analysis focuses on the best-interest portion of the proceedings. We review for clear error the trial court's factual findings and ultimate determinations on the best interests of the child.

*In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014); MCR 3.977(K). The trial court clearly errs when this Court is definitely and firmly convinced it made a mistake. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). Additionally, we will give regard to the trial court's special opportunity to assess the credibility of the witnesses. *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020); MCR 2.613(C).

Once the trial court concludes that DHHS established at least one statutory ground for termination by clear and convincing evidence, the court then examines, by a preponderance of the evidence, whether termination is in the best interests of the minor child. *White*, 303 Mich App at 713; MCL 712A.19b(5). The focus is on the child's best interests rather than the parent's best interests. *Mota*, 334 Mich App at 321. The trial court may weigh a variety of factors, including " 'the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home.' " *White*, 303 Mich App at 713, quoting *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012). The trial court also may consider "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *White*, 303 Mich App at 714. The trial court examines the whole record when deciding whether termination is in the child's best interests. *In re JK*, 468 Mich 202, 211; 661 NW2d 216 (2003). Additionally, the trial court should consider each child individually when determining whether termination is in the child's best interests. *Olive/Metts*, 297 Mich App at 42. While keeping siblings together is in the best interests of each child in most cases, if keeping the children together would be against the best interests of one individual child, then the best interests of that child will control. *Id.*

The trial court did not clearly err by finding that termination was in NLB's best interests considering NLB's strong bond with her foster family; NLB's need for permanency, stability, and finality; respondent-mother's lack of ability to provide a home for NLB; and the advantages of the foster home over respondent-mother's home.

This case involved a lengthy case-service history that predated NLB's birth. Respondent-mother had a long history of cocaine abuse and continued to abuse the drug up until the time of the termination hearings. Meanwhile, NLB has been in foster care for most of her life, starting when she was a young infant. While there was evidence to support that respondent-mother had a bond with NLB, the bond appeared stronger on respondent-mother's end than NLB's end. In fact, visitations had not occurred for a significant duration, and NLB was nervous to be around respondent-mother when visits first resumed in October 2024. It took a while for her to warm back up to respondent-mother.

Respondent-mother maintains that she was close to reunification with NLB at the time of the termination hearing. However, respondent-mother testified at the July 18, 2024 hearing that she had been homeless since November 2023. She did not obtain adequate housing before the final termination hearing. Although she checked herself into a rehabilitation facility for her cocaine addiction, she did not complete the program. She testified that she had not used drugs "recently" but did not specify when her last use was. Respondent-mother also had not demonstrated compliance with her parent-agency agreement, which she acknowledged during the July 2024 best-interest proceeding.

Respondent-mother's visitation history with NLB also was inconsistent. Respondent-mother only resumed visiting NLB on a regular basis shortly before the final best-interest hearing. She attributed her visitation struggles to Jackson. Jackson explained that the issue was that respondent-mother did not call

to confirm numerous weekly visits, despite her instructions to do so. To the extent transportation was an issue, Jackson testified that she obtained bus tickets for respondent-mother and took them to the rehabilitation facility where respondent-mother was living. But respondent-mother was no longer there. Respondent-mother did not ask for assistance with transportation after that time, and Jackson testified that she would have provided help if respondent-mother had asked.

However, even during the resumed visitations, which started in October 2024, respondent-mother failed to demonstrate appropriate behavior during visitations. She inappropriately allowed BLS to act like a parent toward NLB during the initial resumed visit. NLB was nervous during the visit, but respondent-mother did not notice the cues. Eventually, NLB warmed up to respondent-mother after the caseworker reminded respondent-mother three times to give NLB space. Respondent-mother also had not completed any drug screens until after October 2024.

As for her income, respondent-mother received a little over $900 per month in Social Security disability benefits but did not provide DHHS with proof of income. She was looking for housing and planned to live with her mother who could provide financial help. We note that respondent-mother started making progress on her parent-agency agreement by the last best-interest proceeding. Respondent-mother reported to her new caseworker that she was pursuing an education and no longer under the influence of drugs. She was enrolled in a program to obtain a GED. Yet she still had not found appropriate housing or a sufficient source of income. So, respondent-mother still lacked the means to care for NLB.

Thus, while there was some evidence respondent-mother was starting to comply with her treatment plan by the final best-interest hearing, respondent-mother's progress was minimal when considered in the history of the entire case. The progress started at the eleventh hour after a nearly year-long termination proceeding and after years of various issues leading to removal of her children, including NLB. It is important to note that while respondent-mother's history of compliance with her treatment plan is one relevant factor, the overall focus of the analysis should be on NLB's best interests. See *Mota*, 334 Mich App at 321.

As it relates to the other factors, the testimony supported that NLB was thriving in her foster home, and there was a strong possibility of adoption. In fact, respondent-mother voluntarily surrendered NLB to the foster family when she experienced housing issues and issues with DID's behavior. The current DHHS caseworker testified that the foster family was meeting NLB's needs and had no other children in the home. NLB was bonded to her foster parents and called them "Mom" and "Dad." Respondent-mother even went so far as to tell the foster mother she would be "okay" with the foster parents adopting NLB if the case did not go well for her. She believed that the foster mother took good care of NLB, and they had a good bond. Respondent-mother acknowledged NLB was thriving in foster care. She acknowledged it was in NLB's best interests to stay with her foster parents at the moment. There was testimony by the DHHS caseworker that NLB had not shown that respondent-mother's failure to visit affected her. NLB experienced nightmares when she first came back to the foster home but was no longer experiencing nightmares. And, the foster parents were only interested in adoption, not guardianship.

NLB had a strong need for permanency, stability, and finality considering that she spent most of her four years in her foster home, went a lengthy period without visiting respondent-mother, and was thriving in her preadoptive placement. The foster parents were willing to provide a permanent plan for NLB. They also were willing to encourage a bond between NLB and her siblings. So, while respondent-mother's situation may have been improving by the final termination hearing, the trial court did not clearly

err by finding that this development was outweighed by other factors supporting, by a preponderance of the evidence, that termination was in NLB's best interests.

Respondent-mother also argues that the trial court did not terminate her parental rights to four other children at issue in the proceedings, so the court should not have terminated her parental rights to NLB. However, NLB's best interests had to be considered as separate from those of her brothers and sister. Two of NLB's brothers, MCS and MMS, were no longer at issue by the time of the final termination hearing. Both children were older teenage boys who were in a very different situation in life than NLB and were placed in Another Planned Permanent Living Arrangement.

NLB's situation also differed from that of BLS and DID, who were the other children at issue by the final best-interest hearing. Specifically, BLS was nearing 14 years old and was old enough to express her desire against termination. As for DID, he was 12 years old, expressed a strong preference to return to respondent-mother, and had significant special needs for which respondent-mother had advocated and that rendered it less likely that he would be adopted. Moreover, the parental rights of the father of DID and BLS were not subject to termination in the same proceeding, so the permanency plan was not adoption. And while the L-GAL advocated for termination of respondent-mother's parental rights to NLB, he argued that respondent-mother's parental rights to DID and BLS should not be terminated. In contrast, NLB was placed in her preadoptive home where she was thriving. NLB was only four years old when respondent-mother's parental rights were terminated, making her eight years younger than her next youngest sibling. Finally, the preadoptive placement expressed a willingness to ensure NLB maintained her bond with her siblings. Therefore, the children were not similarly situated, and the trial court did not err by adopting the referee's finding that NLB's best interests differed from those of her siblings. For these reasons, the trial court's best-interest determination was not clearly erroneous.

## III. CONCLUSION

For the reasons set forth above, we affirm.

/s/ Michael J. Riordan
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado